**Edward SERZYSKO, Plaintiff,**

v.

**The CHASE MANHATTAN BANK, Defendant.**

**No. 65 Civil 718.**

United States District Court
S. D. New York.
Sept. 19, 1968.

Jay J. Gurfein and Arthur M. Gurfein, of Gurfein & Gurfein, New York City, and Walter Talmont, Garden City, N. Y., for plaintiff.

A. Donald MacKinnon and Adlai S. Hardin, Jr., of Milbank, Tweed, Hadley & McCloy, New York City, for defendant.

## MEMORANDUM

GRAVEN, Senior District Judge (by assignment).

1. The plaintiff is a citizen and resident of the State of New York. The defendant is a corporation engaged in the banking business in the City of New York, New York. The plaintiff seeks to recover damages allegedly caused to him by reason of loans made to him by the defendant, which loans he alleges were made in violation of Regulation U (12 C.F.R. 221) promulgated by the Board of Governors of the Federal Reserve System pursuant to Section 7(a) of the Securities Exchange Act of 1934, 15 U.S.C.A. Sec. 78g. That Regulation relates to the margin requirements for loans made for the purpose of the purchasing or carrying of registered securities. Jurisdiction is based upon the Securities Exchange Act of 1934, 15 U.S. C.A. Sec. 78aa. The trial was to the Court.

Under the provisions of the Securities Exchange Act of 1934 and the regulations promulgated thereunder, issues of stock which are registered on a national securities exchange constitute registered securities. The New York Stock Exchange is a national securities exchange.

2. Commencing in September, 1958, the defendant made the plaintiff a number of loans. The loans were secured by collateral. The collateral in the main consisted of registered securities. In 1962, following a decline in the market value of the collateral, the defendant sold the collateral then remaining and applied the proceeds thereof on the then existing loan of the plaintiff. After applying the proceeds there was an unpaid balance on the loan of approximately $14,000.00. In this action the plaintiff seeks to recover the damages allegedly sustained by him by reason of the loans and such sale. The defendant by a counterclaim seeks to recover from the plaintiff the present unpaid balance of the loan.

3. Section 78g, Title 15 U.S.C.A., provides, in part, as follows:

"(a) For the purpose of preventing the excessive use of credit for the purchase or carrying of securities, the Board of Governors of the Federal Reserve System shall, prior to October 1, 1934, and from time to time thereafter, prescribe rules and regulations with respect to the amount of credit that may be initially extended and subsequently maintained on any security * * * registered on a national securities exchange. * * *

" * * *

"(c) It shall be unlawful for any member of a national securities exchange or any broker or dealer who transacts a business in securities

through the medium of any such member, directly or indirectly to extend or maintain credit or arrange for the extension or maintenance of credit to or for any customer—

"(1) On any security * * * registered on a national securities exchange, in contravention of the rules and regulations which the Board of Governors of the Federal Reserve System shall prescribe under subsections (a) and (b) of this section.

" * * *

"(d) It shall be unlawful for any person not subject to subsection (c) of this section to extend or maintain credit or to arrange for the extension or maintenance of credit for the purpose of purchasing or carrying any security registered on a national securities exchange, in contravention of such rules and regulations as the Board of Governors of the Federal Reserve System shall prescribe to prevent the excessive use of credit for the purchasing · or carrying of or trading in securities in circumvention of the other provisions of this section. * * *."

Paragraph (c) above set forth relates to brokers and dealers. Paragraph (d) above set forth relates to banker lenders.

Pursuant to the authority granted to the Board of Governors of the Federal Reserve System by the Securities Exchange Act of 1934, that Board promulgated Regulations T and U. Regulation T governs the extension of credit to a customer by any member of a national exchange or any broker or dealer transacting business with a member. Regulation U covers loans by banks for the purpose of purchasing or carrying registered securities. Both prescribe minimum margin requirements referred to as maximum loan values which have been varied from time to time. It appears that the regulation places the entire burden of observing the margin requirements on the lender.

The Board of Governors of the Federal Reserve System is charged with the responsibility of promulgating regulations relating to margin requirements and the administration of them. The enforcement of the regulations of that Board has been assigned to the Securities and Exchange Commission. The Securities and Exchange Commission may bring an action to enjoin violators of the Act or to transmit evidence of violations to the Attorney General for the institution of criminal proceedings. Section 78u, Title 15 U.S.C.A.

Section 78ff, Title 15 U.S.C.A., provides, in part, as follows:

"(a) Any person who willfully violates any provision of this chapter, or any rule or regulation thereunder the violation of which is made unlawful or the observance of which is required under the terms of this chapter * * * shall upon conviction be fined not more than $10,000, or imprisoned not more than two years, or both * * *; but no person shall be subject to imprisonment under this section for the violation of any rule or regulation if he proves that he had no knowledge of such rule or regulation.

* * *"

Section 78cc, Title 15 U.S.C.A., provides, in part, as follows:

" * * *

"(b) Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract * * * heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of

such contract was in violation of any such provision, rule, or regulation * * *."

Section 221.1(a) of Regulation U provides, in part:

"No bank shall make any loan secured directly or indirectly by any stock for the purpose of purchasing or carrying any stock registered on a national securities exchange * * * in an amount exceeding the maximum loan value of the collateral, as prescribed from time to time for stocks in Section 221.4 * * *."

In Section 221.3(b) of the Regulation "carrying" is defined as encompassing a loan made "for the purpose of reducing or retiring indebtedness incurred to purchase that stock."

Section 221.3(a) of Regulation U provides:

"(a) In determining whether or not a loan is for the purpose specified * * * a bank may rely upon a statement with respect thereto only if such statement (1) is signed by the borrower; (2) is accepted in good faith and signed by an officer of the bank as having been so accepted; and (3) if it merely states what is not the purpose of the loan, is supported by a memorandum or notation of the lending officer describing the purpose of the loan. To accept the statement in good faith, the officer must be alert to the circumstances surrounding the loan and the borrower and must have no information which would put a prudent man upon inquiry and if investigated with reasonable diligence would lead to the discovery of the falsity of the statement."

Section 78aa, Title 15 U.S.C.A., provides, in part, as follows:

"The district courts of the United States * * * shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder. * * *"

4. The Securities Exchange Act contains no provision providing for a private cause of action for violation of the regulations promulgated by the Board of Governors of the Federal Reserve System relating to margin requirements. Private remedies are expressly provided in connection with violations of certain other sections of the Act. Sections 78i(e), 78p(e), 78r(a), Title 15 U.S.C.A. There are a number of other sections as to which the Act has not provided any private remedies but as to which a private cause of action has been implied. J. I. Case Co. v. Borak (1964), 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423—(implied as to Section 14(a) of the Act Section 78n(a), Title 15 U.S.C.A.). See Notes, 77 Harvard L. Review 285 (1963–1964), 66 Columbia L. Review 1462 (1966). See, also, 61 Michigan L. Review 947 (1962–1963). The weight of authority is to the effect that a private cause of action is to be implied in the case of a violation of the margin regulations promulgated under the provisions of the Act. Smith v. Bear (2d Cir. 1956), 237 F.2d 79, 87–88, 60 A.L.R.2d 1119; Remar v. Clayton Securities Corporation (D.C.Mass.1949), 81 F.Supp. 1014; Appel v. Levine (S.D.N.Y.1948), 85 F.Supp. 240; Warshow v. H. Hentz & Co. (S.D.N.Y.1961), 199 F.Supp. 581; Glickman v. Schweickart & Co. (S.D.N.Y.1965), 242 F.Supp. 670; Moscarelli v. Stamm (E.D.N.Y. July 12, 1968), 288 F.Supp. 453.

This Court holds that a private cause of action for violation of the margin requirements of the Act is to be implied. The troublesome and difficult questions involved in the present case and in certain other cases is as to the nature and character of the implied private cause of action. In all of the District Court cases above cited, the question as to the implied cause of action arose in connection either with motions to dismiss or for summary judgment and there was no evidentiary hearing on the merits. In the present case there was a complete and

lengthy evidentiary hearing at which all of the facts relating to the transactions involved were fully developed.

5. The plaintiff was born in Poland in 1906. He served in the Polish Merchant Marine until 1943. From 1943 up to September, 1952, he served in the United States Merchant Marine. From September, 1952, up until June, 1953, he attended the New York Finance Institute of the New York Stock Exchange. His courses in that Institute included courses on stock exchange transactions. From July, 1953, until October, 1953, he was a trainee with the stockbroker firm of Cosgrove, Miller & Whitehead. From October, 1953, until March 24, 1956, he was a registered representative of that firm and its successor. From March 23, 1960, until May 24, 1962, he was a registered representative of the stockbroker firm of Hill, Darlington & Company and its successor. From May 25, 1962 on, he was a registered representative of the stockbroker firm of Burnham & Company. All of the firms referred to were members of the New York Stock Exchange. As a registered representative of the broker firms referred to, the plaintiff handled the accounts of customers of the firms, including margin accounts.

During the periods of time here involved Harold Hardiman was the executive officer in charge of a branch of the defendant referred to as the Broadway Branch. George Hughes was also an officer of the same branch. During the forenoon of September 8, 1958, Thomas W. Hill, a member of the firm of Hill, Darlington & Company, talked with Mr. Hardiman. Mr. Hardiman had been acquainted with Mr. Hill for some time and regarded him as being highly reputable. Mr. Hill stated to Mr. Hardiman that Edward Serzysko, one of their registered representatives, was desirous of securing a loan from the Chase Manhattan Bank for the purpose of opening up a checking account. Mr. Hill further stated that he had a very high regard for Mr. Serzysko. Mr. Hardiman then brought up the matter of Regulation U. He in-formed Mr. Hill that the Bank would not consider making a loan for use in purchasing or carrying registered securities within the scope of Regulation U. Loans not within the scope of Regulation U are referred to as nonpurpose loans. Mr. Hardiman, Mr. Hill and the plaintiff met for lunch on September 8, 1958, at which time the matter of the loan was discussed. The discussion covered the matter of Regulation U. All of them were familiar with that Regulation. Mr. Hardiman told the plaintiff and Mr. Hill that the Bank would only make a nonpurpose loan. The plaintiff represented to Mr. Hardiman that he desired the loan for the purpose of purchasing convertible bonds and other bonds. The purchase of bonds was not within the scope of Regulation U and a loan for such purpose would be a nonpurpose loan.

Pursuant to the discussion Hardiman prepared the papers for the proposed loan, which papers were dated September 12, 1958. On that date the plaintiff was the owner of registered securities having a market value of $203,704.00. They were pledged with a loan from the plaintiff from Hill, Darlington & Company in the approximate amount of $100,000.00. During the discussion on September 8, 1958, the matter of that loan was not referred to. On September 12, 1958, the Bank made the plaintiff a loan in the sum of $150,000.00 evidenced by a demand note. As security for the payment of the note the plaintiff pledged the shares of stock owned by him which, as heretofore noted, had a market value of around $200,000.00. On September 9, 1958, prior to the closing of the loan, the plaintiff in writing directed the Bank to pay Hill, Darlington & Company approximately $100,500.00 for debit to his account. Upon the delivery of the shares of stock the Bank paid Hill, Darlington & Company the sum of $100,623.03. At the time of the making of the loan the plaintiff was orally informed by Mr. Hardiman that he would be expected to maintain a checking account equal to 10 percent of the loan.

6. In connection with the securing of the loan of September 12, 1958, the plaintiff executed a purpose statement. That statement was, in part, as follows:

### "STATEMENT WITH RESPECT TO PURPOSE OF LOAN

Date  SEP 12 1958

To THE CHASE MANHATTAN BANK,

189 Broadway Branch
(Head Office or Branch)

Pursuant to Regulation U promulgated by the Board of Governors of the Federal Reserve System, the following statement refers to a loan in the amount of $150,000.00, dated SEP 12 1958 due on demand, made by said bank to the undersigned.

A. The above described loan    is not    for the purpose of pur-
                          (is or is not)
chasing or carrying * stock registered on a national securities exchange.

/s/   Edward Serzysko
(Signature of Borrower or Bank Officer)
Edward Serzynsko [sic]

———◆———

\*    \*    \*    \*    \*    \*

The form of purpose statement was apparently one prescribed by the Board of Governors of the Federal Reserve System.

The Bank made the plaintiff several collateral loans. The dates and amounts are as follows:

| Dates | Amounts |
|---|---|
| September 12, 1958 | $150,000.00 |
| October 27, 1958 | 21,000.00 |
| July 30, 1959 | 20,000.00 |
| December 3, 1959 | 35,000.00 |
| January 6, 1960 | 12,000.00 |
| January 16, 1961 | 11,000.00 |
| March 3, 1961 | 21,000.00 |

———◆———

All of the above loans were evidenced by notes payable on demand. On October 2, 1961, the plaintiff's indebtedness to the Bank on his demand notes was renewed by a note for $270,000.00 payable in ninety days. That note was renewed on January 2, 1962, and on April 3, 1962. The issues of stock pledged by the plaintiff for the $150,000.00 loan were twenty-seven in number. The plaintiff testified they were investments of a conservative nature. The market value of the collateral varied during the period of time in question. At the time of the making of the loan of September 12, 1958, the maximum loan value specified under

---

\* Regulation U prescribes that no loan is for the purpose of 'carrying' a stock registered on a national securities exchange unless the purpose of the loan is to enable the borrower to reduce or retire indebtedness which was originally incurred to purchase such a stock."

Regulation U was 30 percent. At the time of the making of the other loans the maximum loan value specified under Regulation U was either 30 percent or 10 percent. The amount of the loans secured by the collateral on the average amounted to approximately 74 percent of the market value of the collateral.

7. The loans made by the defendant to the plaintiff following the loan of September 12, 1958, will next be referred to. On October 27, 1958, the Bank made the plaintiff a loan of $21,000.00 secured by the collateral then held by the Bank. In connection therewith the plaintiff executed a purpose statement similar to that executed in connection with the loan of $150,000.00. In that statement the plaintiff stated that the loan was not for the purpose of purchasing or carrying stock registered on a national securities exchange.

On May 4, 1959, the plaintiff wrote the Bank inquiring how much it would loan him against certain specified convertible bonds.

On July 30, 1959, the Bank made the plaintiff a loan of $20,000.00. The plaintiff stated that he wanted the loan for the purpose of purchasing convertible bonds. In connection with the loan the plaintiff executed a purpose statement. That statement was in different form from the two previous purpose statements. That statement was, in part, as follows:

"STATEMENT WITH RESPECT TO PURPOSE OF LOAN

Date   JUL 30 1959

TO THE CHASE MANHATTAN BANK

Pursuant to Regulation U of the Board of Governors of the Federal Reserve System, the Statement indicated below is made in reference to a loan in the amount of $20,000.00, dated   July 30, 1959,   made by you to the undersigned.

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*

[X]   Statement II.

Said loan is not for the purpose of purchasing or carrying any stock registered on a national securities exchange \* \* \* :

(Check (x) provision that is to apply)

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*

[X]   Other:   Purchase of convertible bonds
                    (Fill Blank)

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*

/s/   Edward Serzysko
Signature of Borrower"

On December 3, 1959, the Bank made the plaintiff a loan of $35,000.00. That loan was handled by George Hughes acting for the Bank. At the time the plaintiff stated to Mr. Hughes that he intended to purchase bonds with the loan. He signed a purpose statement similar to the one just above set forth. In it he stated that the loan was for the "Purchase of Bonds." As collateral security for the loan he deposited with the Bank $13,000.00 Burroughs Corporation 4½% Convertible Subordinated Debentures, some shares of stock he had secured as a dividend, and some shares of stock which he had purchased.

On January 6, 1960, the Bank made the plaintiff a loan of $12,000.00. He stated to Mr. Hardiman that he was going to use the loan to purchase convertible bonds or other bonds. Prior to

the making of the loan the plaintiff deposited with the Bank collateral which consisted, in part, of $10,000.00 Vanadium Corporation of America 4¼% Convertible Subordinated Debentures. The plaintiff executed a purpose statement in which he stated that he was going to use the loan "To purchase convertible or other bonds."

On January 16, 1961, the Bank made the plaintiff a loan of $11,000.00. He requested the loan for the purpose of paying taxes. In the purpose statement signed by him he stated that the loan was for "Taxes." The loan was secured by the collateral then held by the Bank.

On March 3, 1961, the Bank made the plaintiff a loan of $21,000.00. It was heretofore noted that the Bank had informed the plaintiff that he was expected to maintain a balance in his checking account equal to 10 percent of his loan. On March 3, 1961, the balance in his checking account was below that percentage. The loan was made for the purpose of maintaining such balance. In the purpose statement signed by him he stated that the loan was "To maintain balances." That loan was secured by the collateral the Bank then held.

On October 18, 1961, the plaintiff deposited $15,000.00 in United States Treasury Notes as collateral. On May 21, 1962, he deposited $40,000.00 in those Notes as collateral. On June 18, 1962, he deposited $13,000.00 in those Notes as collateral.

8. Following the making of the original loan there were periods when the market value of the collateral substantially increased. There was also some increase in its value due to stock dividends on the stock held as collateral. There was also some increase in the value of the collateral due to the deposit of additional collateral and exchanges of collateral.

A decline in stock market values commenced in 1961 which continued into 1962, and the balance of the plaintiff's checking account went down below 10 percent. Commencing in 1962 the Bank repeatedly urged the plaintiff to maintain a proper balance in his checking account and to reduce his indebtedness and furnish additional collateral. The plaintiff did not so do. From April 18, 1962, to June 7, 1962, after securing margin calls from the Bank, the plaintiff directed the sale of certain of the collateral and reduced the loan from $270,000.00 to $145,000.00. The market continued to decline and in May and June, 1962, the Bank sold the remaining collateral and applied the proceeds upon the plaintiff's loan. After the sale of the collateral there was a balance unpaid on the loan of $14,603.26. Subsequently some payments were made on that balance leaving a balance presently unpaid of $12,749.49 with interest for which the Bank asks judgment against the plaintiff.

Subsequent to the sale by the Bank of the shares of stock held by it as collateral in 1962, there was a steady appreciation in the market value of those shares. The plaintiff testified that as of January, 1958, the value of the shares sold by the Bank taking credit for stock splits and stock dividends had value of between $659,000.00 and $675,000.00.

On March 9, 1965, the plaintiff commenced the present action. In his complaint the plaintiff, after setting forth the loans made to him by the defendant, goes on to state:

"16. That all loans were collateralized by securities registered on the New York Stock Exchange and American Stock Exchange which the plaintiff was carrying or had purchased out of borrowed funds which facts were known to the defendant or in the exercise of reasonable prudence should have been known to the defendant.

"17. That the defendant's conduct in making the loans and maintaining the loan account was in violation of the Securities and Exchange Act of 1934 and Regulation U promulgated by the Federal Reserve Board.

"18. That by reason of defendant's violation of the statute and Regulation

as aforesaid, the plaintiff has been damaged in the sum of $268,031.00."

Prior to the trial the plaintiff moved to amend the ad damnum clause to ask "for the return of the securities sold by the defendant in May and June of 1962 or the present value thereof."

It is apparent from the proposed amendment that the plaintiff is of the view that there would be available in the stock market for acquisition by the defendant shares of stock which are the same as those sold by the defendant in 1962 and that the defendant should be required to replace them. That request is, in substance, asking for rescission of the loan transactions. In the event that return of the shares not be had, the plaintiff seeks to recover the damages allegedly caused to him by the sales of the stock in 1962.

The plaintiff, as collateral for the original loan, pledged 27 issues of stock. Over 20 issues of that stock were still in the collateral in 1962. It was heretofore noted that the plaintiff testified that those issues constituted conservative investments. He further testified that he made use of the proceeds of the loans made to him by the defendant to purchase speculative issues.

The matter as to the amount of damages was by agreement of counsel deferred pending a determination of the issue as to liability.

The plaintiff testified that he used the available proceeds of the loans exclusively for the purpose of purchasing or carrying registered securities. The plaintiff alleges that the defendant either knew or in the exercise of reasonable diligence should have known that he was using the proceeds of the loans for such purposes and hence the loans were in violation of Regulation U.

9. It is the contention of the plaintiff that where a lender makes a loan enabling the borrower to reduce or retire an indebtedness which was originally incurred for the purchase of registered securities such a loan constitutes a loan for the purpose of carrying regis-

tered securities in violation of Regulation U. It is the view of the Court that such is the proper interpretation of Regulation U. The plaintiff further contends that in the situation just above referred to the fact that the borrower has signed a purpose statement stating that the loan was not being obtained for the purpose of carrying registered securities does not absolve the lender from responsibility under Regulation U if the lender in the exercise of reasonable diligence would have ascertained that such was not the true situation. The plaintiff further contends that where a borrower is using the proceeds of loans to purchase and carry registered securities notwithstanding his having signed statements that the proceeds would not be so used, there is a violation of Regulation U if the lender could have discovered such misuse in the exercise of reasonable diligence.

10. The evidence preponderates that the plaintiff knowingly and intentionally, by oral and written statements, deceived the Bank as to the purposes for which he intended to use the proceeds of the loans. The evidence preponderates that none of the officers of the defendant having to do with the loans had any actual knowledge of the falsity of the plaintiff's statements or his misuse of the proceeds of the loans. Where the proceeds of loans made by a bank are used by the borrower for the purpose of purchasing or carrying registered securities the fact the lender has no actual knowledge of such use does not completely answer the question as to whether Regulation U has been violated. Regulation U would be violated if the lender in the exercise of reasonable diligence should have known that the proceeds were being so used. Manifestly, if all that was required by a lender was to have the borrower execute a purpose statement and nothing more the object and purpose of that Regulation could be easily thwarted. The plaintiff contends that he was not a sophisticated investor. He testified that he was not familiar with the provisions of Regulation U. He

also testified that several of the purpose statements were signed by him in blank and that the statements contained therein as to the use of the proceeds of the loans were afterwards incorrectly filled in by the defendant. The Court finds that the plaintiff was a sophisticated investor and was familiar with the provisions of Regulation U and that the statements contained in the purpose statements as to purposes of the loans were in accord with his representations.

The plaintiff calls attention to certain evidence which he asserts supports his claim that the defendant in the exercise of reasonable diligence should have discovered that the proceeds of the loan were being used by him for the purpose of purchasing or carrying registered securities. During negotiations for the original loan there was no discussion of the loan had by the plaintiff with Hill, Darlington and Company. However, later the plaintiff gave the Bank a written order to pay around $100,000.00 of the proceeds of the loan to Hill, Darlington & Company to be debited to the plaintiff. When Hill, Darlington & Company delivered the securities held by that firm to the Bank, on a statement accompanying the delivery there appeared in typewriting the words "Margin—25." Mr. Hardiman testified that he did not observe those words on the statement and did not learn until after the last original loan was made in 1961 that the amount paid to Hill, Darlington & Company was in payment of a margin account loan of the plaintiff with that firm arising out of the purchase of registered securities.

The plaintiff also calls attention to the evidence which shows that on three occasions during the loan period the defendant made payments directly to Hill, Darlington & Company from the proceeds of loans to the plaintiff's credit against the delivery of registered securities to be added to the plaintiff's collateral. On November 17, 1960, the defendant paid Hill, Darlington & Company $26,009.95 against delivery of 525 shares of stock. On November 25, 1960,

the defendant paid Hill, Darlington & Company $1,418.34 against the delivery of 100 shares of Avnet Electronics Corporation. On February 16, 1962, the defendant paid Hill, Darlington & Company $13,065.05 against the delivery of 300 shares of Thiokol Chemical Corporation.

Mr. Hardiman testified that during the latter part of the loan period he began to be suspicious that the plaintiff was not using the proceeds of the loans in accord with his purpose statements. The defendant after January 3, 1961, made no further new loans to the plaintiff and in 1962 liquidated the collateral.

The question of reasonable diligence on the part of the defendant is troublesome. The plaintiff had been recommended to the defendant as being highly reputable. The plaintiff both orally and in writing had repeatedly stated that the loans were not being used for the purpose of purchasing or carrying registered securities. The defendant's branch which handled the loans conducted a large business with a myriad of transactions involving the receipt and delivery of registered securities held as collateral. However, some of the plaintiff's activities, as shown by the defendant's records, were such as to indicate that he was not using the proceeds of the loans in accord with his oral and written representations. The situation was such as to indicate the need for investigation on the part of the defendant as to the use he had been and was making of the proceeds of the loans. Such investigation would have disclosed the fact that the plaintiff, contrary to his representations, had been using part of the proceeds of some of the loans for the purpose of purchasing or carrying registered securities. The Court is of the view that the defendant in the exercise of reasonable diligence would have discovered the falsity of the plaintiff's representations.

11. In the present case there was a violation of Regulation U by the defendant in connection with some of the loans due to its failure to exercise

reasonable diligence. In the present case the plaintiff was a registered representative of a brokerage firm who was experienced and sophisticated in the matter of the investment of registered securities and the purchase of such securities on margin and familiar with the provisions of Regulation U. By false oral and written representations he induced and brought about the violation of Regulation U.

The defendant makes several contentions. It contends that the plaintiff is not within the class of those entitled to maintain an implied right of action for violation of the margin requirements of the Securities Exchange Act of 1934 and Regulation U promulgated thereunder. The defendant also contends that the conduct of the plaintiff in connection with the loans was such as to bar any recovery on his part under the implied right of action. The defendant makes the further contention that the claims of the plaintiff based upon the first two loans are barred by the statute of limitations.

The first two contentions of the defendant will be next considered. Those contentions bring up for consideration the substantive features and the character of the private cause of action implied under the margin requirements of the Securities Exchange Act of 1934 and the regulations promulgated thereunder.

The early and landmark case in this area is the case of Remar v. Clayton Securities Corporation (D.C.Mass.1949), 81 F.Supp. 1014. In that case the plaintiff owned certain securities. He was advised by a broker to purchase other securities. The broker arranged with a bank to loan the plaintiff money to so do. The plaintiff pledged the securities owned by him and the securities purchased by means of the loan as collateral for the loan. Later the bank sold the collateral and there was a loan deficiency. The loan violated Regulation U. The plaintiff brought an action against the broker for the damages sustained by him for the loss of the securities. Recovery was sought under the provisions of Section 7(c) of the Securities Exchange Act of 1934 relating to margin requirements. The defendant moved to dismiss the complaint on the ground that the plaintiff did not have a remedy under that Act. The motion was overruled. The Court stated (p. 1017):

"The Securities and Exchange Act does not expressly give a right or remedy to a private person injured by § 7(c) of that Act. But such a right may nonetheless be implied. * * * The general principle regarding civil liability for violations of prohibitory statutes has been put with precision in Restatement, Torts, § 286 [1934]. Broadly stated, the rule is that where defendant's violation of a prohibitory statute has caused injury to plaintiff the latter has a right of action if one of the purposes of the enactment was to protect individual interests like the plaintiff's.

"That rule applies to the case at bar. Undoubtedly 'the main purpose' of § 7 of the Securities and Exchange Act was 'to give a government credit agency an effective method of reducing the aggregate amount of the nation's credit resources which can be directed by speculation into the stock market.' House Com.Rep. 73rd Cong., 2nd Sess. No. 1383. But Congress recognized that 'protection of the small speculator by making it impossible for him to spread himself too thin * * will be achieved as a by-product of the main purpose.' Ibid. * * *

"Plaintiff's right of action is not affected by his participation as borrower in the transaction in which Clayton and the bank violated the statute. Since the statute was passed for the benefit of people like plaintiff, and since the Legislature regarded him as incapable of protecting himself, he is not disabled from suing for the injury he sustained. See Restatement, Torts, § 286 comment j * * *."

The Court goes on to state (p. 1017):

"In holding that a private person may have a right of action under § 7(c), I have not considered and do not

decide whether this plaintiff has suffered damages which are the proximate consequence of Clayton's violation. * * *"

Restatement of Torts, Sec. 286 (1934), referred to in the opinion, provides, in part:

"§ 286. VIOLATIONS CREATING CIVIL LIABILITY.

"The violation of a legislative enactment by doing a prohibited act, or by failing to do a required act, makes the actor liable for an invasion of an interest of another if:

"(a) the intent of the enactment is exclusively or in part to protect an interest of the other as an individual; and

" * * *

"(d) the violation is a legal cause of the invasion, and the other has not so conducted himself as to disable himself from maintaining an action."

In a hearing before the Senate Committee on Banking and Currency, 73d Congress, 1st Session, pt. 15, at page 6494, Mr. Corcoran, one of the drafters of the Exchange Act stated in regard to the matter of margin provisions:

"One is to protect the lamb; another, and probably the more important of the two * * * is the protection of the national business system from the fluctuations that are induced by fluctuations in the market, which in turn stem back to this very exquisite liquidity you get when you have a lot of borrowed money in the market."

At a hearing before a Senate Committee on the Securities Exchange Act of 1934, a representative of the Federal Reserve Board stated:

"We are less concerned about what happens to him [the large buyer], because he is very likely a person who knows the game, whereas when there are a thousand people buying on a small scale, they are buying it blind, and I think our interest, socially, is to protect them against the stock market." Hearings before Committee on Interstate and Foreign Commerce, 73d Congress, 2d Session 74 (1934).

In a Note, Federal Margin Requirements As A Basis For Civil Liability, 66 Columbia L. Review 1462, 1482–83 (1966), the author stated:

" * * * In the case of the knowing plaintiff-purchaser, however, the policy considerations are different. On the one hand, section 7 manifests an intention that the lender bear the entire burden of compliance with the margin requirements. On the other, the predominant purpose of the provision is to prevent 'the excessive use of credit for the purchase or carrying of securities.' Where the investor is a willful participant in a transaction violative of the margin regulations, these policies cannot be reconciled by allowing him to undo his contractual obligations whenever they prove unfavorable. Such license would serve as an incentive for margin traders to effect as many illegal transactions as possible. In this situation the two policies unavoidably conflict, and the policy against excessive security credit should prevail over the subsidiary intent to impose the burden of compliance upon the lender only. The sophisticated investor should therefore be deemed an accomplice to the defendant's violation and denied the right to rescind the contract under section 29 (b)."

In a Note in 61 Michigan L. Review 940 (1963), relating to private remedy for violation of margin requirements, the author stated (p. 954):

"Perhaps the tort remedy should be available to an inexperienced trader in certain cases, but not to a sophisticated trader who knowingly assumes the risk of an inadequate margin. * * *

"It seems likely that courts will continue to imply civil remedies for violations of credit regulations, at least for the protection of inexperienced margin traders. However, recovery should be denied to the sophisticated trader on the ground that he is an accomplice in

the violation. Denying him a remedy would serve as a greater deterrent to future violations * * * than an allowance of relief. * * *"

12. It was heretofore noted that it was the contention of the defendant that the plaintiff, being a sophisticated trader, is not within the class of those who may bring an implied private action based upon violation of the margin requirements.

There is a distinction between the matter of a person being within the general class of those who may bring a private action based on a violation of a regulatory statute and the right of such person to prevail on the merits in such an action when brought. To attempt to define the classes of investor-borrowers who may bring an action for the violation of Regulation U in terms of the extent of their sophistication would present difficulty. In many cases the determination of the extent of the sophistication of the investor-borrower would require a preliminary evidentiary hearing. It would seem that one who comes within the classification of an investor-borrower in connection with loans on registered securities may bring a private action for the damages allegedly sustained by him by reason of the violation of Regulation U subject to his being denied recovery on the merits. In connection with the merits the sophistication of a particular investor-borrower could, as in the present case, be of relevance in connection with the question as to whether his conduct should prevent recovery by him.

It is the view of the Court that notwithstanding the fact the plaintiff was a sophisticated investor-borrower he is not for that reason prohibited from bringing this private action for the damages allegedly sustained by him by reason of violation of Regulation U. However, his sophistication enters into the situation in connection with the matter of his wrongful conduct, i. e., the procuring and inducing of loans by means of false representations. Because of his sophistication, he was familiar with Regulation U and knew what would con-

stitute violations of it. Nevertheless, he knowingly and intentionally procured or induced the violations of which he now complains.

13. Where a plaintiff brings an action based upon a violation of a regulatory statute, there is frequently presented the question as to what effect is to be given to his own wrongful conduct in connection with the violation. That question would seem to be connected with the question as to the nature of the action. In the case of Goldenberg v. Bache and Company (5th Cir. 1959), 270 F.2d 675, there was involved in a private action by an investor against a broker the matter of the violation of Regulation T. In connection with the nature of the action the Court stated (p. 680):

"This action could be looked on either as an action *ex contractu,* based on the contract between stockbroker and customer as affected by the federal statute and regulations, or as an action *ex delicto,* based upon 'federal canon law torts.' * * *"

In the case of Warshow v. H. Hentz & Co. (S.D.N.Y.1961), 199 F.Supp. 581, the plaintiff in his complaint alleged the making of a loan to him in violation of the margin requirements of the Act. The plaintiff sought either rescission or damages. The Court overruled a motion to dismiss the complaint. It stated (p. 582):

"Section 29(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78cc(b), provides that every contract which violates any provision of the Act or regulations thereunder is void and unenforceable by the party violating the Act, and the other party is entitled to rescission. * * * Further, the complaint supports a claim for damages sustained as the proximate consequence of defendant's act made illegal by Section 7(c) of the Act, 15 U.S. C.A. § 78g(c). * * *"

Under the case of Remar v. Clayton Securities Corporation, supra, and cases following that decision, it appears that an action by an investor against a lender

based upon a violation of Regulation U is regarded as an action in tort under the rules stated in Section 286, Restatement of Torts (1934). Treating the action as a tort action gives rise to a number of troublesome questions as to the application of well-recognized tort rules relating to contributory negligence and other conduct of the plaintiff and causation and damages.

In all situations relating to violations of Regulation U, there is always present the feature of the investor having executed the note for the loan involved. Therefore, he is in a sense a participant in the making of the illegal loan. However, it was noted in the case of Remar v. Clayton Securities Corporation, supra, that the Court held that the plaintiff's right of action was not barred by his participation in the making of the illegal loan. It would seem that the mere fact that the investor participated in the making of a loan which violated Regulation U does not per se bar him from relief.

Under Section 286 of the Restatement heretofore set out and which has, in general, been regarded as applicable to actions brought for violation of the margin requirements of the Securities Exchange Act of 1934, it is stated the violator of a legislative enactment, subject to certain requirements, is liable for damages legally caused to another. One of those requirements is that the complaining party "has not so conducted himself as to disable himself from maintaining an action." However, there are certain decisions of the United States Supreme Court that have to be considered in connection with the last portion of the Restatement Rule just referred to.

In the case of J. I. Case Co. v. Borak, (1964), 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423, the plaintiff brought a private action based upon a claimed violation by the defendant of Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C.A. 78n(a). The Act did not expressly provide for a private action for a violation of that Section. The Court held that a private cause of action would be implied not only for the protec-

tion of investors but also to provide a necessary supplement to the Securities and Exchange Commission's enforcement of the provisions of the Act. In that connection it mentioned that the statutory treble damage action provided for in civil antitrust actions served as an effective weapon in the enforcement of the civil antitrust statute. The matter of the wrongful conduct of a plaintiff in connection with the matter of the recovery of damages allegedly sustained by him by violation of a regulatory statute was recently considered by the United States Supreme Court in the case of Perma Life Mufflers, Inc. v. International Parts Corporation (June 10, 1968), 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982. In that action the plaintiffs sought to recover statutory treble damages from the defendants under the provisions of 15 U.S.C.A. Sec. 15 for violation of the civil antitrust laws. The claimed violation occurred in connection with franchise arrangements. The defendants made a motion for summary judgment based upon a showing that the plaintiffs had participated in the franchising arrangements. The motion was sustained by the trial court. That ruling was affirmed by the Seventh Circuit Court of Appeals (376 F.2d 692). On appeal the Supreme Court reversed. It stated (p. 135 of 392 U.S., p. 1982 of 88 S.Ct.):

"The principal question presented is whether the plaintiffs in this private antitrust action were barred from recovery by a doctrine known by the Latin phrase *in pari delicto,* which literally means 'of equal fault.' * * "

The Court further stated (pp. 138–139 of 392 U.S. p. 1984 of 88 S.Ct.):

" * * * There is nothing in the language of the antitrust acts which indicates that Congress wanted to make the common-law *pari delicto* doctrine a defense to treble-damage actions, and the facts of this case suggest no basis for applying such a doctrine even if it did exist. Although *in pari delicto* literally means 'of equal fault,' the doctrine has been applied, correctly or incorrectly, in a wide va-

riety of situations in which a plaintiff seeking damages or equitable relief is himself involved in some of the same sort of wrongdoing. We have often indicated the inappropriateness of invoking broad common-law barriers to relief where a private suit serves important public purposes. * * * The plaintiff who reaps the reward of treble damages may be no less morally reprehensible than the defendant, but the law encourages his suit to further the overriding public policy in favor of competition. A more fastidious regard for the relative moral worth of the parties would only result in seriously undermining the usefulness of the private action as a bulwark of antitrust enforcement. And permitting the plaintiff to recover a windfall gain does not encourage continued violations by those in his position since they remain fully subject to civil and criminal penalties for their own illegal conduct.

* * * * "

■ Thus it appears that the rules stated in Section 286 of the Restatement in regard to a private cause of action for violation of legislative enactments must be considered in the light of the Supreme Court cases just referred to. Under the doctrine of those cases a private cause of action for violation of a regulatory statute must be considered in the light of the enforcement of such a statute.

It is to be noted that in the case of Perma Life Mufflers, Inc. v. International Parts Corporation, supra, the action for treble damages was based upon an express statutory provision. That is not the situation in the present case. It is also to be noted that in that case the Court noted that the plaintiffs as participating wrongdoers would themselves be subject to statutory civil and criminal penalties. That is not the situation in the present case. It is also to be noted that in that case it appeared that the defendants actively and knowingly participated in the claimed violations. That is not the situation in the present case.

■ 14. The purpose statement to be signed by an investor-borrower in connection with the securing of a loan is of importance in carrying out the object and purpose of the margin requirement regulations. The knowing and intentional making of a false statement by an investor-borrower in a purpose statement is fraught with prejudice to the enforcement of such regulations. If an investor-borrower could by means of false representations and statements mislead a lender into making a loan for the purchasing or carrying of registered securities when the lender did not know or intend that the loan would be used for such purpose, and then recover heavy damages from the lender on the basis that the lender in the exercise of reasonable diligence should have discovered the deceit, there would be encouragement for an investor-borrower to engage in the practice which, in substance, would be that so far as the investor-borrower is concerned he could keep the profits if his speculation proved profitable and have the lender bear the loss if the speculation proved unprofitable.

■ 15. In some of the cases referred to reference is made to the doctrine of *in pari delicto* which is said to literally mean "of equal fault." The term *in pari delicto* has been applied to a variety of situations. It is the view of the Court that whatever the scope that doctrine may be it can hardly be said that one who is deceived by false representations of another can be said to be *in pari delicto* with him because of the fact that the deception might have been discovered in the exercise of reasonable diligence. It is clear from the decisions that in connection with an implied private cause of action for violation of a regulatory statute there must be taken into consideration the matter of supplementing the enforcement of the statute. The enforcement of such a statute is supplemented when the rules applied in private actions having to do with its violation are such as to tend to encourage the observance of the statute and to deter nonobservance of it. It is the view of the Court that to allow the plaintiff to recover in this action would be to encourage rather than discourage deception on the part of in-

vestor-borrowers with resulting prejudice to the observance of the margin requirements of the Act. In the case of Moscarelli v. Stamm, supra, the Court was of the view that to permit an investor-borrower who had wilfully participated in the violation of a margin requirement to recover damages for such violation would defeat the purpose of such requirement. The law tends to look with a jaundiced eye upon the claim of a deceiver that his victim should not have been deceived. However, in the case of the margin requirements here involved there is again involved the matter of the enforcement of a regulatory statute. Under the requirements of the margin regulations here involved, a lender in making a loan may not safely ignore the possibility of deceit on the part of the investor-borrower as to the use of the proceeds of the loan and to that end is required to exercise reasonable diligence under the circumstances in connection with the matter of the probable misuse of the proceeds of the loan on the part of the investor-borrower.

Some of the occurrences in connection with and following the arrangements for the loans were such as to indicate the reasonable likelihood that the plaintiff was using the proceeds of the loans for the purchasing or carrying of registered securities. If an investigation had been made it would have revealed that the plaintiff, contrary to his oral and written statements, was making use of the proceeds of some of the loans to purchase or carry registered securities. It is the view of the Court that the defendant should have made such an investigation and that in not doing so the defendant failed to exercise reasonable diligence.

16. It was heretofore noted that the defendant by counterclaim seeks to recover the unpaid balance of the last loan made which is in the approximate sum of $12,000.00. Under the provisions of Section 221.3(a) of Regulation U heretofore set out, a lender is chargeable with exercising reasonable diligence in the matter of inquiring and investigating as to possible misconduct of the borrower in connection with the loan and the failure of the lender to exercise such diligence makes the loan a violation of Regulation U. Under the provisions of 15 U.S.C.A. Sec. 77cc(b) heretofore set out, contracts which are in violation of Regulation U are declared void.

It is the view of the Court that the note upon which the defendant seeks to recover comes within the scope of that Section.

17. It is the view of the Court that the plaintiff, by reason of his conduct, should be denied the relief requested by him. Such denial renders it unnecessary for the Court to pass upon the partial defense of the defendant based on the statute of limitations.

18. It is the view of the Court that the defendant, by reason of its failure to exercise reasonable diligence, should be denied the relief requested by it.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the subject matter of this action and the parties to the action.

2. The plaintiff is not justly entitled to the relief requested by him.

3. The defendant is not justly entitled to the relief requested by it.