**Joel J. TARTELL, Plaintiff,**

v.

**CHELSEA NATIONAL BANK,
Defendant.**

**No. 69 Civ. 1462.**

United States District Court,
S. D. New York.

March 21, 1972.

Young & Sonnenfeld, New York City, by Harold L. Young, New York City, for plaintiff.

Carro, Spanbock & Londin, New York City, by Jerome J. Londin, New York City, for defendant.

## OPINION

TYLER, District Judge.

Joel J. Tartell, a New York resident, commenced this action against the defendant ("the bank" or "Chelsea") alleging violations by the latter of Sections 7, 10(b) and 29(b) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78g, 78j and 78cc(b), in connection with a bank loan initially obtained from the defendant in April, 1966. Defendant bank counterclaimed to recover the unpaid balance of a loan in October, 1966 of $8,700.00, plus interest, expenses and counsel fees incident to this action. For reasons to be discussed herein, it is concluded that the plaintiff is not entitled to recover damages under the various theories set forth in his complaint. It is also concluded that defendant may recover on its counterclaim as and to the extent discussed in this opinion.

This case was tried to the court without a jury. As the briefs and evidence indicate, the principal contentions arise in respect to the alleged violations of Regulation U under Section 7(d) of the 1934 Act. Given the uncertainties of application of Sections 7 and 29(b), see e. g. Pearlstein v. Scudder & German, 429 F.2d 1136 (2d Cir., 1970), the suit understandably has raised a welter of claims and contentions. To fully understand the contentions and the rulings herein made, it may be useful to set forth the theories of plaintiff in his demands for damages under the three "Counts" or claims of his complaint. Under his first claim, plaintiff seeks to recover from the bank the sum of $114,229.00 comprised of $80,000.00 for the value of the collateral to the loan which he says he lost, $31,300.00 for the amount of principal he repaid to the ·bank and the sum of $2,929.00 said to be the interest paid by plaintiff to the bank. From the total of these figures, plaintiff would have the court deduct

the current market value of any securities which defendant bank still holds as collateral for his loan or loans as extended with interest from April 20, 1966. Under the second claim, plaintiff, upon the theory that defendant required him to purchase stock in an insurance company known as Hamilton Life made certain fraudulent misstatements in violation of Section 10(b) of the 1934 Act, and Rule 10b–5 thereunder, with resultant damages to him in the amount of $15,327.00, with interest from November 1, 1966. Finally, under the third claim, plaintiff prays that the loan agreement as extended and any current indebtedness thereunder be declared rescinded "as of after October 1, 1966 but prior to October 14, 1966, . . ." and that defendant deliver back to him any collateral securities owned by plaintiff and heretofore held as collateral by the bank. It also should be noted that plaintiff prays for an award of reasonable counsel fees and the costs and disbursements of this action.

Although the facts in this case are to a considerable degree reflected by contemporaneous documents in evidence, there are nevertheless to be found important issues of credibility and questions regarding the appropriate inferences to be drawn from uncontested evidentiary matters.

In April, 1966, plaintiff was 33 years of age and employed as a pharmacist. He was also studying acting here in the City of New York. At that time, plaintiff's friend and insurance broker directed him to a Mr. Isaac Imber, then a director of the bank. Plaintiff told Imber that he was interested in obtaining a bank loan. Thus, Imber arranged by telephone to have plaintiff meet the president of the bank, Mr. Louis Asterita, on April 11, 1966.

On Monday, April 11, plaintiff went to the bank and conversed with Asterita. Plaintiff sought a loan based upon the collateral of various securities, which he then owned in a margin account with Hornblower & Weeks-Hemphill Noyes

("Hornblower").[1] Apparently, plaintiff in some particularity told Asterita that at Hornblower his collateral consisted of 2300 shares of Acme Missile, 206 shares of Kawecki Chemical Company, and 1000 shares of Commonwealth United Corporation, Series A, all of which securities were then listed on the American Stock Exchange and had, as Asterita checked at that meeting, an aggregate market value of $80,200.00. In response to questions, plaintiff advised Asterita that the purposes of the loan from his point of view were to "furnish him a credit rating in the event that he would open a business in . . . real estate." When Asterita asked plaintiff how much he wished to borrow, plaintiff put him off by inquiring how much the defendant bank would be willing to lend. Asterita proposed a short term loan in the amount of $40,000.00 secured by the aforesaid $80,200.00 worth of securities then in plaintiff's Hornblower account. Contrary to plaintiff's testimony, Asterita made no mention of either Regulation T or Regulation U of the Federal Reserve Board. It is found, however, that plaintiff told Asterita that he intended to maintain a checking account balance at the bank in the sum of $12,000.00.

Also on April 11, plaintiff opened a checking account at the bank and deposited initially the sum of $500.00. Asterita informed plaintiff that he would prefer to get the approval of the bank loan committee before finally preparing the loan papers.

Accordingly, sometime between April 11 and 14, plaintiff was advised by Asterita over the telephone that the bank's loan committee had approved the loan. On April 14, plaintiff again went to Asterita's office where he was asked to sign the bank's form of promissory note in the principal amount of $40,000.00 and a purpose statement for the loan. There is dispute between Asterita and plaintiff

as to exactly what transpired in connection with the signing of this purpose statement. I do not credit much of plaintiff's testimony on this subject. Specifically I find that he did read the purpose statement in substance before he signed it, and that if it were Asterita and not he who printed in the words that the purpose of the loan was for "real estate investment", he told Asterita that this was the fact.

Parenthetically, it is not insignificant that prior to April, 1966 and for a period of many years, plaintiff had had a variety of brokerage accounts, some cash and some margin, at a number of brokerage houses in the City of New York. Contrary to his disclaimers, I find that he was substantially aware of the requirements for collateralized loans and in particular with the requirements of Regulations T and U.

On April 20, 1966, the bank credited plaintiff's checking account with the sum of $39,444.00 which was the discounted face amount of the loan. On the previous day, April 19, however, there commenced a most curious transaction which plaintiff blames on the bank and essentially amounted to his personally picking up from Hornblower a check payable to his order in the sum of $15,000.00 and depositing it in his Chelsea checking account. On the following day, April 20, the bank routinely certified a check, at plaintiff's direction, payable back to Hornblower in the same sum of $15,000.00, which cashier's check was then delivered to Hornblower. Coincidentally, also on April 20, Chelsea issued its bank check, signed by Mr. Asterita, to the order of Hornblower in the sum of $21,150.00 in order to pay off plaintiff's indebtedness to Hornblower and thereby free his collateral for the bank loan. Although Chelsea and Asterita were well aware of the $21,150.00 payment to Hornblower, there is no persuasive evidence that they then were

---

1. Contrary to the thrust of plaintiff's contention and testimony, it is found that he did not advise Asterita of the existence of another margin account of his at the firm of Coggeshall & Hicks ("C & H").

aware of the curious reciprocal $15,000.-00 transaction between plaintiff and Hornblower.

In April, 1966, Regulation U as promulgated by the Federal Reserve Board provided that the maximum loan value of the collateral any bank could accept in connection with loans secured directly or indirectly by stock listed on a national securities exchange was 30% of the current market value of the collateral security.

On May 16, 1966, at Chelsea's request, plaintiff delivered additional collateral for his loan consisting of 2000 shares of Commonwealth United Corporation having a then market value of about $14,000.

It appears that around July 14, 1966, plaintiff, at the bank's insistence, had reduced the balance of his loan to approximately $26,000.00 by the sale of a portion of the collateral. On that date plaintiff's loan was renewed for the reduced amount for an additional three month period. Later, on or about September 19, plaintiff further reduced the balance of his loan upon the sale of some more collateral by the sum of $11,500.00. Thus, on October 27, 1966, the loan was paid down to $15,000.00 and on that date renewed as a demand loan in that amount.

Previously, in mid or late August, 1966, plaintiff had a conversation with a Mr. F. W. Kripple, a Vice President of Chelsea regarding the loan. In the course of that conversation, Kripple advised plaintiff that the bank was unhappy with the loan because of the volatile nature of the collateral and plaintiff's sluggishness in responding to collateral calls. In early October, another Vice President of Chelsea, Mr. A. K. Lauckner, also told plaintiff that Chelsea was not happy with the loan because of the unsatisfactory and volatile nature of the collateral. Lauckner at that time made what amounted to an additional collateral call upon plaintiff. It is plaintiff's claim that Lauckner then and there insisted that this additional collateral had

to be in the form of the over the counter stock of Hamilton Life Insurance Company. According to plaintiff, he then at the insistence of Lauckner disposed of all of his other collateral and substituted therefore 1250 shares of Hamilton Life. The purchase price of Hamilton Life was $15,327.00. Plaintiff's testimony in this respect is found to be incredible. In actuality, it was plaintiff's idea and not that of Lauckner or the bank that he substitute his existing collateral with 1250 shares of Hamilton Life stock. The record amply establishes that plaintiff had a number of friends in the securities brokerage and life insurance businesses who were then touting Hamilton Life to him as good stock. Since Lauckner was able to check the then current market value of Hamilton Life and found it to be satisfactory, the bank agreed to accept the substitution of Hamilton Life as described heretofore. Unfortunately, in the fall of 1968, the securities of Hamilton Life became practically worthless. Earlier, in February, 1968, over the counter trading of Hamilton Life had been suspended because of the company's financial difficulties. Hence, beginning at that time, the bank unsuccessfully sought to have plaintiff shore up his collateral or else suffer the call of his loan. Plaintiff did not heed these requests but finally retained counsel who filed this suit on his behalf. In short, for whatever reason, the bank was the slower in the race of two tortoises to the court house door.

I

█ Perhaps as a makeweight, plaintiff contends that in October, 1966 Chelsea fraudulently induced him to purchase common stock of Hamilton Life Insurance Company in violation of Section 10(b) of the Securities & Exchange Act of 1934 and Rule 10b–5 promulgated under that statute. This claim is demonstrably of no merit if only because, as already indicated, I do not find plaintiff's testimony credible on the Hamilton Life acquisition for collateral of his loan. In point of fact, no officer or

agent of defendant in any way attempted to sell plaintiff this security, to work any fraud upon him or make any misstatement of fact regarding Hamilton Life. All that happened was that Mr. Lauckner, upon learning from plaintiff that he wished to buy Hamilton Life, ascertained that the current market value was from 10 to 15 points and thus acceptable in terms of collateral of the loan as it was then paid down. Moreover, it is clear beyond any serious doubt that plaintiff became interested in Hamilton Life as a result of certain social and business acquaintances with others than the defendant.

## II

The principal claim of plaintiff, of course, is that the April 20, 1966 loan of $40,000 was a violation of Regulation U. Plaintiff's theory is simply stated. In his view, the bank violated Regulation U because $40,000 was loaned on collateral of $80,200 at a time when the provisions thereof would limit the loan to 30% of $80,200 or $24,060.

The difficulty with plaintiff's theory is that he has improperly aggregated the purpose and non-purpose portions of the $40,000 loan made by Chelsea. There can be no doubt that Regulation U theoretically applies to the loan in question in that the securities were listed on a national exchange and because part of the loan proceeds were to be used to carry securities. Section 7(b) of the 1934 Act plainly and expressly relate to "credit for the purpose of purchasing or carrying any security." Thus, Regulation U is concerned only with purpose credit—i. e. credit for the acquisition or carrying of securities. Non-purpose credit was not and is not a concern of the 1934 Act or Regulation U. In April, 1966, the pertinent Rule, 12 C.F.R. 221.1(b), stated in significant substance that " . . . the entire amount of the credit extended to any customer by any bank at any time for the purpose of purchasing or carrying stocks registered on a national securities exchange shall be considered a single credit; . . . "

It is true that the purpose statement for plaintiff's loan makes no reference to the payment of $21,150 made to Hornblower in the loan process in order to effectuate the transfer of collateral from that brokerage firm to Chelsea. But, Asterita was aware of this portion of the transaction—i. e. he knew that the collateral was to be forthcoming from Hornblower and that plaintiff owed Hornblower this sum. In short, as Chelsea concedes, it is chargeable with knowledge that the purpose portion of the loan amounted to $21,150.00.

The "double $15,000 transaction" on April 19 and 20, 1966 is quite another matter. It does not establish any liability on the part of the bank to plaintiff. As indicated, the plaintiff deposited $15,000 in his new checking account at Chelsea on April 19. On the following day he obtained a check of $15,000 payable to Hornblower. This was a certified or cashier's check issued on the basis of the $15,000 check deposited in plaintiff's account the day before. There is no evidence that Asterita knew anything about this, nor did any other loan officer of the defendant. Accordingly, the issuance of the $15,000 cashier's check by defendant on April 20 did not violate Regulation U or the 1934 Act.

On April 21, plaintiff made out a check in the amount of $14,280 to C&H. This check was presented to and paid by defendant on April 25, which was about the time when Asterita was packing up to leave Chelsea's employ. According to plaintiff, he used this money to pay for his purchase on April 19 of 2000 shares of the common stock of Commonwealth United Corporation. He did not discuss this transaction with anyone in the bank, and no one in the bank seems to have known anything about it until May, 1966 when Lauckner looked over the account. As will appear, though this purchase pushed his purpose loan over the 30% limit for a time, plaintiff cannot

establish liability of Chelsea therein under Regulation U or otherwise.

■ In hindsight, Chelsea and Asterita were naive and slipshod in their evaluation and investigation of plaintiff and their paper work in opening the account —doubtless because Chelsea at that time was a relatively new organization. While the "purpose-non-purpose" dichotomy of the regulation was not initially violated by the bank, the failure of the bank to exercise reasonable diligence in investigating the truthfulness of Tartell's purpose statement, 12 C.F.R. § 221.3(a), made the loan technically a violation of Regulation U as did the aforementioned purchase of Commonwealth United through C&H. Nevertheless, plaintiff cannot prevail in the face of his own willful misleading of Asterita and the bank. Serzysko v. Chase Manhattan Bank, 290 F.Supp. 74 (S.D.N.Y.), aff'd mem., 409 F.2d 1360 (2d Cir.), cert. denied, 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180 (1969). To explain more particularly this conclusion, it first should be noted that Asterita was told by plaintiff that he intended to use the proceeds of the loan, save for the portion needed to purchase and transfer the collateral from Hornblower to Chelsea, to establish a credit rating and to invest in real estate. Imber had reported essentially the same intentions of plaintiff to Asterita. Thus, Asterita was entitled

to assume that since the amount being paid to Hornblower was less than 30% of the collateral, there was no violation of Regulation U. A loan officer looking closely, as Lauckner did, at the account of plaintiff and his securities transactions later in the spring of 1966, would be entitled to observe that the account was "out of balance"—i. e. in violation of Regulation U as a result of his additional purchase of Commonwealth United on April 19. The bank, however, was contemporaneously unaware of this transaction, which was plaintiff's own doing. He willfully misled the bank in this respect and cannot be permitted to recover any damages.[2]

## III

On July 14, 1966, plaintiff's $40,000 loan had been paid down to $26,500 and was renewed for a period of three months in that amount. Later on, on October 27, 1966, plaintiff's loan was renewed in the reduced amount of $15,000. Although not certain of this, I believe that plaintiff maintains that both of these renewals in some fashion violated Regulation U and the 1934 Act. If so, he has not made out his case. In regard to the July renewal, there is no proof as to the exact amount by which that reduced loan was margined. Furthermore, I accept Mr. Lauckner's testimony that the violation of Regulation U brought

2. Plaintiff's reliance on Pearlstein v. Scudder and German, 429 F.2d 1136 (2d Cir., 1970), is misplaced. In Pearlstein, the Court of Appeals specifically stated that the plaintiff had not made any willful or misleading statements of material fact and, accordingly, refused to "follow or to attack" the holding in Serzysko, supra. Moreover, aside from the negligence-willfulness distinction, Pearlstein and the instant case are not analogous.

It is arguable that the broker deterrence theory of the majority in Pearlstein as applied to Regulation T has some utility in an approprite Regulation U case. Insofar as Regulation T is concerned, however, the broker does not have to rely on investor information. Regardless of whether the investor has used friendly persuasion or misleading state-

ments, the broker need only deny extension of credit beyond a seven day limit to insulate himself from liability. On the other hand, under Regulation U the bank must rely on investor information for the purpose statement. A violation of Regulation U occurred in the instant case essentially because Chelsea carelessly "policed" the loan in April, 1966 or until Lauckner took over the account in early May. Under these circumstances, weighty arguments can be made that equity and deterrence demand a balancing of guilt under Regulation U regardless of whether the borrower has been negligent or willful, rather than focusing solely on the wrongdoing of the broker as in Pearlstein where the broker alone had control over his acts of commission.

about by plaintiff through his secret purchase of 2000 shares of Commonwealth United from C&H had been corrected by that date in that more collateral was put up by plaintiff at the insistence of Lauckner himself.

■ Turning to the October 27, 1966 loan, the record indicates that all of plaintiff's original collateral in the form of securities listed on national securities exchanges had been sold prior to that date. The cash from these sales was used for collateral for a short time and then used to purchase the aforementioned Hamilton Life Insurance stock, which, of course, was a stock traded over the counter and not over a national exchange. By then existing provisions of Regulation U, there could have been no violation thereof by the renewal in the reduced amount of $15,000 on October 27, 1966.[3]

Finally, I note that Chelsea may be correct in its argument that even if a violation of Regulation U by the bank were assumed, in regard to any of the loans, plaintiff has fallen short of the mark of proving any causal relationship between such a violation and his claimed losses or damages which he prays. As I appraise the record documents and his testimony, plaintiff agreed to sales of Commonwealth United and Acme Missiles to pay down his collateral. See Exhibits 16–18, 23. Indeed, but for these sales, Tartell would have lost a great deal of money because these two securities plummeted way down on the market. See trial stipulation regarding quotations. This, of course, was also true in regard to Hamilton Life, a stock which became virtually worthless in 1968. In sum, it is not far from the mark to say that plaintiff's losses were his own doing; indeed they could have been worse but for the tighter policing of his loan by Lauckner and other representatives of the bank beginning in late May, 1966.

**IV**

■ The demand note executed by plaintiff on October 27, 1966 was in the sum of $15,000 with interest at 7%. See Exhibit 22. On December 1, 1967, the interest rate on that loan was raised to 7½%. Finally, on May 1, 1968 the interest rate was again increased to 8% per annum. There remains unpaid on that loan the sum of $8,700, together with interest at the rate of 8% from October 25, 1968. Despite demand therefor, plaintiff has never paid the aforesaid principal sum or the accrued interest or any part thereof. This loan in the amount of $15,000, as stated earlier, was not subject to and not in violation of Regulation U. Furthermore, the April 20, 1966 extension of credit which was in violation of Regulation U had been corrected at least by July 14, 1966. The provisions of § 29(b) of the Securities Exchange Act, 15 U.S.C.A. § 78cc(b), therefore, do not apply to void this loan agreement.[4] Plaintiff has no defense to these demands, and should respond in damages for the amount of principal and interest as aforesaid.

As Judge Friendly noted in *Pearlstein, supra,* the language of § 29(b) is, indeed, "draconian". Nonetheless, assuming *arguendo* that the October 27, 1966 loan was somehow tainted or a part of the April 20, 1966 loan, § 29(b) would not void the loan agreement. The contract was not in violation of Regula-

---

3. Following enactment on July 29, 1968 of the so-called "Over-the-Counter Margin Act", Public Law 90–437, Section 221.3 of Regulation U was amended to cover certain over-the-counter securities. 34 C.F.R. 9205.

4. Section 29(b) of the Securities Exchange Act provides in pertinent part:

"Every contract made in violation of any provision of this title or of any rule or regulation thereunder, and every contract . . . the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void . . . as regards the right of [violators]. . . ."

tion U and while the failure of Chelsea to exercise reasonable diligence rendered performance of the contract a violation, there is no indication that § 29(b) was meant to apply where there has been performance by. the violator and the willful deceit of one party to the contract has been a primary and proximate cause of a negligent violation by the other party. See Pearlstein v. Scudder and German, *supra* at 1145 (dissent). Section 29(b), as Judge Friendly noted in dissent in *Pearlstein*, "was a legislative direction to apply common-law principles of illegal bargain, enacted at a time when it seemed much more likely than it might now that courts would fail to do this without explicit legislative instruction." *Id.* at 1149. Application of § 29(b) in the instant case and refusal to look beyond its "pat formula" would be a disservice to the legislative intent and an injustice to Chelsea.

### V

■ As stated preliminarily, the bank has demanded attorneys' fees to cover this suit in reliance on a provision set forth in its loan agreement forms.[5] It appears that under the law of New York, such a note covenant is enforceable. See First Nat. Bank & Trust Co. of Elmira v. Conzo, 169 Misc. 268, 7 N. Y.S.2d 334 (Sup.Ct. Chemung Co., 1938). *According to Chelsea*, the reasonable value of the services herein of its experienced attorneys is the sum of $15,000.[6]

It appearing that New York courts would enforce such a covenant in a bank note such as this one, the question may be asked whether or not the facts that

(1) plaintiff won the race to a federal court house door and (2) plaintiff's suit was predicated upon federal statutory law should preclude this court from granting counsel fees to the bank. The federal statutes underpinning plaintiff's claims in this case do not specifically provide for counsel fees; indeed, the usual rule is that in the absence of statutory authority or an authorizing contract, federal courts do not award counsel fees. See, e. g., Kahan v. Rosenstiel, 424 F.2d 161, 165 (3d Cir., 1970). Here, with contractual authority, I conclude that such fees should be allowed. In part, this conclusion seems justified in light of the broad language of the demand note in question. See fn. 5 *supra*. Surely, counsel fees of the bank are "incidental to, the enforcement of any of the provisions hereof or any of the liabilities . . ." Put differently, not only was the bank obliged to file a counterclaim to recover the balance of the October 27 loan still due and owing, but also Chelsea was required to vigorously defend against Tartell's claims in order to recover on its counterclaim. Furthermore, if it be argued that Tartell should not be unfairly penalized for asserting claims, as was his right, under the applicable federal statutes, the answer is that he must be charged with realization of the covenant language in his demand note and awareness that his claims might be found wanting on the merits.

Nevertheless, in the interest of fairness, I do not think that Tartell should be required to pay the $15,000 demanded by the bank. Given that Chelsea's counsel, because of his obvious ability, experience and reputation, can command pri-

---

5. For the provision in question, see p. 2 of Exhibit 22, as follows:
 " . . . The undersigned (Tartell) will pay to the Bank all expenses (including expense for legal services of every kind) of, or incidental to, the enforcement of any of the provisions hereof or of any of the liabilities, or any actual or attempted sale, or any exchange, enforcement, collection, compromise or settlement of any of the Security or receipt of the proceeds

thereof, by litigation or otherwise, including expense of insurance, and all such expenses shall be *indebtedness* within the terms of this note . . . "

6. It is asserted that counsel expended "approximately 90 hours" and disbursements of "approximately $350", plus additional unspecified time. See p. 45 of defendant's post-trial brief and stipulation at last day of trial.

vate fees of this amount, I conclude that fairness and reasonableness in the light of the time spent, the amount of the unpaid balance, etc., require a reduced award of counsel fees in the amount of $5,750, which amount, incidentally, shall be deemed to include disbursements.

To summarize, it is ruled that all of the plaintiff's claims must be dismissed on the merits. The defendant's counterclaim to recover $8,700 plus accrued interest from October 25, 1968, has been proved, and defendant is entitled to judgment thereon. Defendant is also entitled to recover costs, including attorneys' fees in the aforesaid amount of $5,750. Let judgment be entered accordingly.