**BONNIE & COMPANY FASHIONS, INC. and Bonnie Boerer, individually, Plaintiffs,**

v.

**BANKERS TRUST COMPANY, Defendant.**

**91 Civ. 0341 (DNE).**

United States District Court, S.D. New York.

Jan. 29, 1997.

Budd Larner Gross Rosenbaum Greenberg & Sade, P.C., New York City (Paul A. Marber, of counsel), for plaintiffs.

Moses & Singer, L.L.P., New York City (Joel David Sharrow, of counsel), Kravet & Vogel, L.L.P., New York City (Joseph A. Vogel, of counsel), Bankers Trust Company, New York City (Jack H. Weiner, of counsel), for defendant.

### OPINION & ORDER

EDELSTEIN, District Judge:

Currently before this Court is a motion for partial summary judgment brought by individual plaintiff Bonnie Boerer ("Boerer" or "plaintiff"). Defendant Bankers Trust Company ("defendant," the "Bank," or "BTC") opposes plaintiff's motion for summary judgment. For the following reasons, plaintiff's motion is granted in part and denied in part.

### BACKGROUND

This case arises from an alleged breach of a factoring agreement (the "Factoring Agreement") between plaintiff Bonnie & Company Fashions, Inc. ("Bonnie & Co.") and BTC. The facts underlying this litigation are set forth in detail in *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 945 F.Supp. 693, 699–702 (S.D.N.Y.1996) (the "1996 Opinion"), and therefore, they will be recited herein only where necessary to resolve the instant motion for summary judgment. Boerer and Bonnie & Co.'s ("plaintiffs") Complaint contains six counts, all of which arise from BTC's alleged violations of the Factoring Agreement. *See* (Complaint and Jury Demand, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 91 Civ. 0341 ("Complaint") ¶¶ 8–66 (Jan. 2, 1991).) BTC also filed eleven affirmative defenses, includ-

ing seven counterclaims. *See* (Answer with Counterclaims, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 91 Civ. 0341 ("Answer") ¶¶ 20–55 (Dec. 5, 1991).)

In the 1996 Opinion, this Court considered defendant's motion for summary judgment. The 1996 Opinion granted summary judgment to BTC in full and in part on several different Counts of plaintiffs' Complaint, as well as on a number of BTC's affirmative defenses and counterclaims. *Bonnie & Co.*, 945 F.Supp. at 733–34. On January 21, 1997, this Court denied both parties' motions for reargument concerning the 1996 Opinion. *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 170 F.R.D. 111 (S.D.N.Y.1997). This Court will now describe the claims which the parties' each made and those which remain intact prior to this Court's resolution of the instant motion.

Plaintiffs' Complaint alleges the following counts against defendant: (1) breach of the Factoring Agreement; (2) breach of fiduciary duty; (3) negligence; (4) release of the $1,000,000 Treasury Bill which Boerer posted as collateral for Bonnie & Co.'s debts to BTC; (5) breach of the Factoring Agreement, breach of fiduciary duty, negligence, fraud, breach of duty of confidentiality, emotional distress, lost profits and salary, and emotional distress for breach of contract; and (6) litigation costs. (Complaint ¶¶ 8–66.)

Defendant's Answer sets forth the following affirmative defenses against plaintiffs: (1) failure to state a claim upon which relief can be granted; (2) plaintiffs' breach of the Factoring Agreement; (3) defendant did not breach the Factoring Agreement; (4) plaintiffs waived their claims by failing to timely object to defendant's alleged breaches of the Factoring Agreement. (Answer ¶¶ 20–29.) In its Answer, defendant's fifth through eleventh affirmative defenses simultaneously allege defendant's first through seventh counterclaims. These claims are: (1) BTC's Fifth Affirmative Defense/First Counterclaim for plaintiffs' unpaid liabilities of $127,608.35 plus interest; (2) BTC's Sixth Affirmative Defense/Second Counterclaim for indemnification pursuant to the Factoring Agreement; (3) BTC's Seventh Affirmative Defense/Third Counterclaim for payment of $127,608.35

pursuant to Boerer's Limited Guaranty contract; (4) BTC's Eighth Affirmative Defense/Fourth Counterclaim for costs and expenses pursuant to the Limited Guaranty; (5) BTC's Ninth Affirmative Defense/Fifth Counterclaim for a declaratory judgment affirming its superior interest in the Treasury Bill, an order foreclosing its perfected security interest in the Treasury Bill and a recovery of costs associated with the liquidation of the Treasury Bill; (6) BTC's Tenth Affirmative Defense/Sixth Counterclaim for an injunction ordering Boerer to direct the bank holding the Treasury Bill to release it to BTC; and (7) BTC's Eleventh Affirmative Defense/Seventh Counterclaim for costs attributable to BTC's efforts to obtain the Treasury Bill after Boerer allegedly wrongfully instructed the bank holding the collateral not to release it to BTC. *Id.* ¶¶ 31–55.

In the 1996 Opinion, this Court granted in part and denied in part defendant's motion for summary judgment. This Court granted summary judgment to defendant on Counts Two and Three, plaintiffs' claims for, respectively, breach of fiduciary duty and for negligence. *Bonnie & Co.*, 945 F.Supp. at 733. This Court granted in part and denied in part defendant's motion for summary judgment on Count One, plaintiffs' claim for breach of the Factoring Agreement. *Id.* This Court denied summary judgment because a factual issue exists as to defendant's alleged breach, but granted summary judgment on plaintiffs' claim for punitive damages. *Id.* at 711. This Court also denied defendant's motion for summary judgment on that part of Count Four in which plaintiffs sought release of the Treasury Bill and compensatory damages, but granted summary judgment to defendant on plaintiffs' claim in Count Four for punitive damages. *Id.* at 733.

This Court granted defendant's motion for summary judgment on Count Five on plaintiffs' claims for breach of fiduciary duty, negligence, fraud, breach of duty of confidentiality, emotional distress, and for damages for emotional distress for breach of contract. *Id.* This Court, however, denied defendant's motion for summary judgment on plaintiffs' Count Five claims for breach of the Factor-

ing Agreement and for damages from lost profits and salary. *Id.*

Finally, this Court denied defendant's motion for summary judgment on that part of Count Six in which plaintiffs seek payment for their costs associated with Count One, and granted defendant's motion for summary judgment on that part of Count Six in which plaintiffs seek payment of their costs associated with Count Two. *Id.*

In addition, this Court granted in part and denied in part defendant's motion for summary judgment on its eleven affirmative defenses and seven counterclaims. *Id.* at 733–34. This Court denied defendant's motion for summary judgment on its first four affirmative defenses, as well as on its Fifth Affirmative Defense/First Counterclaim, Seventh Affirmative Defense/Third Counterclaim, Ninth Affirmative Defense/Fifth Counterclaim, Tenth Affirmative Defense/Sixth Counterclaim and Eleventh Affirmative Defense/Seventh Counterclaims. *Id.* This Court, however, granted defendant's motion for summary judgment on defendant's Sixth Affirmative Defense/Second Counterclaim and Eighth Affirmative Defense/Fourth Counterclaim. *Id.* at 733.

This Court also denied all of the following in its 1996 Opinion: (1) plaintiffs' request for additional time to conduct discovery; (2) plaintiffs' motion for leave to file additional affidavits in response to defendant's motion for summary judgment; and (3) plaintiffs' motion to take a second deposition of a non-party witness; and (4) plaintiffs' request for a jury trial. This Court also dismissed as moot defendant's motion for a protective order.

The instant motion for summary judgment was brought by plaintiffs after defendants filed the motion for summary judgment which was the primary subject of the 1996 Opinion, but before this Court issued the 1996 Opinion. In the instant motion, Boerer asserts that she is entitled to summary judgment on: (1) Count Four which seeks the return of the Treasury Bill, (Plaintiff Bonnie Boerer's Memorandum of Law In Support of Her Motion For Partial Summary Judgment, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.,* 91 Civ. 0341 ("Pltf. Memo") at 6

(Nov. 7, 1996)); and (2) defendant's counterclaims which seek attorneys' fees, *id.* at 12–13. Specifically, plaintiff moves for summary judgment with respect to three of defendant's counterclaims for attorneys' fees: (1) defendant's Sixth Affirmative Defense/Second Counterclaim which seeks attorneys' fees based on Section 6.2 of the Factoring Agreement; (2) defendant's Eighth Affirmative Defense/Fourth Counterclaim which seeks attorneys' fees based on the Limited Guaranty; and (3) defendant's Eleventh Affirmative Defense/Seventh Counterclaim which seeks attorneys' fees arising from Boerer's alleged wrongful instruction to the bank holding the Treasury Bill not to release it to defendant. *Id.* at 12–13 & 21. Defendant opposes Boerer's motion for summary judgment. (Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion For Partial Summary Judgment, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.,* 91 Civ. 0341 ("BTC Opp. Memo") (Dec. 16, 1996).)

## DISCUSSION

This Court will consider each of the issues on which plaintiff seeks summary judgment individually. As a preliminary matter, however, this Court will set forth the legal standard controlling motions for summary judgment.

## I. SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure ("Rule") 56, summary judgment is appropriate where "the pleadings, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). The movant may discharge this burden by demonstrating to the court that there is an absence of evidence to support the non-moving party's case on an issue which that party would have the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323,

106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). As the Second Circuit has noted, "[i]t has long been the rule that on summary judgment the inferences to be drawn from the underlying facts contained in [the moving party's] materials must be viewed in the light most favorable to the party opposing the motion." *Lendino v. Trans Union Credit Info. Co.,* 970 F.2d 1110, 1112 (2d Cir.1992) (quotation omitted).

To defeat a motion for summary judgment, the non-moving party must do "more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Instead, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e); *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. If the adverse party does not respond to the motion for summary judgment, "summary judgment, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. 56(e).

■ In considering a motion for summary judgment, a court is not to resolve contested issues of fact, but rather, it is to determine the existence of any disputed issues of material fact. *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The existence of a genuine issue of material fact depends on both the genuineness and the materiality of the issues raised by the motion. *See Scottish Air Int'l, Inc. v. British Caledonian Group,* 867 F.Supp. 262, 266 (S.D.N.Y.1994), *aff'd,* 81 F.3d 1224 (2d Cir.1996). Indeed, "the mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.,* 758 F.2d 839, 840 (2d Cir.1985) (per curiam). To evaluate a fact's materiality, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). While "disputes over facts that might affect the outcome of a suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citations omitted); *see Knight,* 804 F.2d at 11–12. According to the Supreme Court, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a judge or jury to resolve the parties' differing versions of the truth at trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510 (quotation omitted).

## II.  PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Boerer moves for summary judgment on two issues: (1) the immediate return of the $1,000,000 Treasury bill which Boerer posted as collateral, a claim pleaded in Count Four of the Complaint; and (2) defendant's claims for attorneys' fees which are pleaded as defendant's Sixth Affirmative Defense/Second Counterclaim, Eighth Affirmative Defense/Fourth Counterclaim, and Eleventh Affirmative Defense/Seventh Counterclaim. Defendant opposes plaintiff's motion for summary judgment. Because this Court issued its 1996 Opinion after plaintiff filed its moving papers, but before defendant filed its opposition submissions, the parties' arguments are not directly responsive to each other. Instead, defendant's arguments are based on plaintiff's moving papers as well as the 1996 Opinion, which plaintiff did not have when it submitted its motion. For ease of organization, this Court briefly will summarize the parties' respective arguments, and their implications for this Court's resolution of the instant motion.

### A.  Summary of the Parties' Arguments

In support of its motion for summary judgment, plaintiff makes two arguments. First, plaintiff claims that the $1,000,000 collateral is intended to secure Bonnie & Co.'s liabilities that arise from its unpaid BTC factor accounts. Plaintiff then argues that, because its factor accounts recently have been paid as a result of a bankruptcy settlement, plaintiff is entitled to the release of the $1,000,000 collateral. Second, plaintiff asserts that BTC is not entitled to have plaintiffs reimburse

BTC for its attorneys' fees in this litigation, other than those costs arising from BTC's "expenses of collection" of the Bonnie & Co. indebtedness.

In its opposition to plaintiff's motion for summary judgment, defendant also makes two arguments. First, defendant argues that, under the agreements between the parties, plaintiffs are liable for all of BTC's litigation costs in this case. Moreover, defendant asserts that the $1,000,000 Treasury Bill is collateral for plaintiffs' liabilities for defendant's unpaid legal expenses as well as for Bonnie & Co.'s unpaid factor accounts. In addition, BTC's second argument—which has no corresponding argument in plaintiffs' initial submission—is that the issues raised by the instant motion were settled by this Court's 1996 Opinion, and thus, constitute "the law of the case," and should not be re-litigated. This asymmetry is due to the 1996 Opinion which, as previously noted, this Court handed down after plaintiff filed the instant motion, but before defendant filed its opposition papers.

Defendant's arguments affect the structure of this Court's resolution of the instant motion. Plaintiffs' motion separated its two claims—release of the collateral and defendant's entitlement to attorneys' fees—into two independently argued portions of its motion. Defendant's first argument, however, merges these two issues by hinging the release of the collateral upon plaintiffs' liability for defendant's attorneys' fees. As a result, this Court cannot address the first issue on which plaintiff seeks summary judgment without also considering the second.

There are thus two inter-related issues to be considered in the instant motion for summary judgment: (1) whether plaintiff's $1,000,000 collateral should be released, including whether plaintiffs' liability for BTC's attorneys' fees is secured by the collateral; and (2) the extent to which plaintiffs are liable for BTC's attorneys' fees. Complicating matters still further is defendant's law of the case argument. Because that argument is potentially dispositive of plaintiff's motion for summary judgment, this Court will consider it first.

## B. BTC's Law of the Case Argument

BTC argues that this Court already has found that the Factoring Agreement "clearly and unambiguously renders Bonnie & Co. liable for all expenses incurred by BTC in connection with BTC's efforts to collect from Bonnie & Co. any obligation, 'arising out of or in any way related to this [Factoring] Agreement.'" *Id.* at 2; *Bonnie & Co.*, 945 F.Supp. at 728. BTC also points out that this Court further determined that BTC is entitled to "full reimbursement by Bonnie & Co. of all of its reasonable attorneys' fees, costs and disbursements 'arising out of or in any way related to' the Factoring Agreement." (BTC Opp. Memo at 2–3); *Bonnie & Co.*, 945 F.Supp. at 729. Accordingly, BTC argues that "th[is] Court's prior rulings constitute the law of the case and plaintiffs' motion must be denied for this reason alone." (BTC Opp. Memo at 10.)

BTC asserts that "[i]t is well-settled in this Circuit that a [c]ourt should reconsider its prior rulings only when presented with 'cogent' or 'compelling' reasons to do so, such as 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Id.* BTC then claims that "nothing 'cogent' or 'compelling' has occurred in this case to justify reconsideration of this Court's prior denials of the relief plaintiffs again seek by the instant motion." *Id.* at 12. Instead, BTC maintains that "[t]he only factual event that has occurred in the interim is that in May 1995 BTC received a distribution from the Allied/Federated bankruptcy with respect to certain invoices that had previously been charged back to the Bonnie & Co. account." *Id.* BTC contends that it "credited the amount of these payments to the Bonnie & Co. account[,] thereby reducing the amount of the Bonnie & Co. indebtedness by the amount of the payments." *Id.* at 12–13.

BTC argues, however, that "even after these monies were applied as of May 1995, the Bonnie & Co. account still remained in a debit balance reflecting the significant amount of attorneys' fees and expenses that had been incurred by BTC through that date in prosecuting and defending this lawsuit...." *Id.* at 13. Furthermore, BTC

maintains that, under the Factoring Agreement, its attorneys' fees and expenses in this litigation are "expressly chargeable to the Bonnie & Co. account." *Id.*

In reply to BTC's law of the case argument, Boerer claims that BTC "ignores the pivotal change of circumstances that has occurred since 1992 and the present, namely, the Allied/Federated Bankruptcy payment that mooted [BTC's] $127,608 counterclaim." (Plaintiff Bonnie Boerer's Reply Memorandum of Law in Support of Her Motion For Partial Summary Judgment, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 91 Civ. 0341 ("Pltf. Reply Memo") at 27 (Dec. 23, 1996).) According to Boerer, "[t]his 'new evidence' warrants this Court in deciding anew whether Boerer is entitled to the release of her $1[,000,000] side-collateral." *Id.* Moreover, Boerer contends that BTC's law of the case argument "is premised on a mischaracterization of this Court's prior decisions." *Id.* Specifically, Boerer claims that BTC incorrectly argues that this Court's previous denials of summary judgment on Count Four were premised on BTC's continuing legal expenses, rather than on "the fact that [BTC's] $127,608 counterclaim was still pending and still theoretically accruing interest." *Id.* at 28–29. Boerer claims that now that BTC's $127,608 counterclaim has been "mooted" by the Allied/Federated payment, "it is proper for th[is] Court to decide these previously undecided issues...." *Id.* at 29.

■ As this Court recently observed, "[t]he law of the case doctrine has 'developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single lawsuit.'" *Walsh v. McGee*, 918 F.Supp. 107, 111 (S.D.N.Y.1996) (Edelstein, J.) (quoting 18 Charles A. Wright, *et al.*, Federal Practice & Procedure § 4478, at 7889 (1981). That doctrine "do[es] not involve preclusion by final judgment; instead [it] regulate[s] judicial affairs before final judgment." Wright, *et al.*, § 2278, at 788. Although a common label is used, the law of the case doctrine encompasses several different sets of rules. *Id.* The rules that BTC invokes in the instant motion are those governing a court's ability to follow its own prior rulings. *Id.*

■ "The most distinctive law of the case rules are those that justify refusal by a trial court to reconsider matters once resolved in a continuing proceeding." *Weitzman v. Stein*, 908 F.Supp. 187, 193 (S.D.N.Y.1995) (Edelstein, J.), *aff'd in relevant part*, 98 F.3d 717 (2d Cir.1996). It is important to note that law of the case rules "come[ ] into play only with respect to issues previously determined," *Quern v. Jordan*, 440 U.S. 332, 347 n. 18, 99 S.Ct. 1139, 1148 n. 18, 59 L.Ed.2d 358 (1979), and that "questions that have not been decided do not become law of the case merely because they could have been decided." Wright, *et al.*, § 4478, at 789. In general, law of the case rules discourage the reconsideration of matters previously decided "absent 'cogent' or 'compelling' reasons." *Baden v. Koch*, 799 F.2d 825, 828 (2d Cir. 1986); *Conrad v. Beck–Turek, Ltd.*, 891 F.Supp. 962, 967 (S.D.N.Y.1995). They do not, however, limit a court's ability to reconsider an issue if the court deems such reconsideration appropriate. *In re PCH Assoc.*, 949 F.2d 585, 592 (2d Cir.1991); *Weitzman*, 908 F.Supp. at 193. Rather, "[l]aw of the case principles ... are a matter of practice that rests on good sense and the desire to protect both court and parties against the burdens of repeated reargument by indefatigable diehards." Wright, *et al.*, § 4478, at 790. As Justice Holmes explained, the law of the case doctrine "merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power." *Messinger v. Anderson*, 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912).

■ Moreover, when a court considers whether to apply the law of the case doctrine, "it may prove proper to draw distinctions that rest on the stage that the proceeding has reached." Wright, *et al.*, § 4478, at 791. Rulings made at the pretrial stage, "may often be subject to reconsideration as a case progresses toward trial." *Id.* Thus, "[a] trial judge ... should be particularly sensitive to the advantages of correcting mistakes so as to avoid a taint that may infect all further trial proceedings or provoke an avoidable appeal." *id.*, § 4478, at 791–92; *see also Champaign–Urbana News Agency,*

*Inc. v. J.L. Cummins News Co.*, 632 F.2d 680, 683 (7th Cir.1980). Accordingly, an initial denial of summary judgment does not foreclose, as law of the case, a subsequent grant of summary judgment on an amplified record. *See, e.g., United States v. Horton,* 622 F.2d 144, 148 (5th Cir.1980).

To reiterate, the instant motion for summary judgment places before this Court two related issues: (1) whether to release Boerer's $1,000,000 collateral, including whether BTC's legal fees are secured by Boerer's collateral; and (2) the extent to which plaintiffs are liable for BTC's attorneys' fees. Because BTC raises its law of the case defense to each of these two issues, this Court must consider that doctrine's applicability to each of them.

■ First, this Court finds that changed circumstances provide both "cogent" and "compelling" reasons to reconsider plaintiffs' Count Four claim for the release of Boerer's $1,000,000 collateral. In the 1996 Opinion, this Court found that each party's claims for money from the other party created a material issue of disputed fact which rendered summary judgment inappropriate. *Bonnie & Co.*, 945 F.Supp. at 714–15. However, in support of the instant motion, Boerer has come forward with new evidence to demonstrate that BTC's $127,608 counterclaim has been paid. (Pltf. Memo at 5.). BTC does not dispute this evidence. Moreover, while not new evidence, the $1,000,000 Treasury Bill which Boerer seeks to have returned is Boerer's personal, rather than a corporate, asset. Accordingly, this Court finds compelling Boerer's interest in the expeditious determination of the Treasury Bill's release. As a result, this Court finds it appropriate to reconsider whether to grant summary judgment on Count Four.

Moreover, this Court finds that the law of the case poses no obstacle to this Court's present consideration of whether plaintiffs' liability for BTC's legal fees are secured by Boerer's $1,000,000 collateral. The law of the case doctrine applies only to issues which actually have been decided by a court. *See* Wright, *et al.,* § 4478 at 789. The issue of whether the collateral secures plaintiff's liability for BTC's attorneys' fees has not yet been considered by this Court, and thus, the law of the case is inapplicable to it.

■ Second, this Court finds that the law of the case does not bar this Court's present consideration of the extent of plaintiffs' liability for BTC's attorneys' fees. In the 1996 Opinion, this Court granted summary judgment to BTC on its Sixth Affirmative Defense/Second Counterclaim, finding that Section 6.2 of the Factoring Agreement "entitles defendant to full reimbursement by Bonnie & Co. of all of its reasonable attorneys' fees, costs and disbursements arising from BTC's attempts to collect debts from Bonnie & Co. 'arising out of or in any way related to' the Factoring Agreement." *Bonnie & Co.*, 945 F.Supp. at 728. The 1996 Opinion also granted summary judgment to BTC on its Eighth Affirmative Defense/Fourth Counterclaim, finding that, pursuant to the Limited Guaranty, "Boerer rendered herself personally liable for BTC's attorneys' fees and other costs in BTC's efforts to collect Bonnie & Co.'s indebtedness, if any." *Id.* at 730. Moreover, the 1996 Opinion denied BTC's motion for summary judgment on its Eleventh Affirmative Defense/Seventh Counterclaim, in which BTC sought to have plaintiffs' held liable for BTC's expenses as a result of Boerer's alleged wrongful instruction to a bank not to release the Treasury Bill to BTC. *Id.* at 731.

This Court observes once again that the chronological idiosyncracy of the instant motion has made the parties' submissions somewhat unusual. In plaintiff's initial memorandum in support of its motion for summary judgment, plaintiff argues that BTC is not entitled to any attorneys' fees arising from this litigation. (Pltf. Memo at 12.) That memorandum, however, was filed before this Court issued the 1996 Opinion which found that BTC is, indeed, entitled to attorneys' fees from plaintiffs for BTC's collection efforts. *Bonnie & Co.*, 945 F.Supp. at 728–29, 730. In drafting its memorandum in opposition to summary judgment, BTC, unlike plaintiff, had the benefit of the 1996 Opinion. BTC thus argued that the 1996 Opinion found that BTC was entitled to reimbursement by Bonnie & Co. for all of its attorneys' fees, "both to defend plaintiffs' claims as well

as to prosecute its own counterclaims." (BTC Opp. Memo at 3.) In addition, BTC presented arguments in support of an award of attorneys' fees which it did not make on behalf of its own motion for summary judgment. *Id.* at 2–7.

Plaintiff's reply memorandum is therefore the first submission on behalf of its motion for summary judgment which was able to refer to the 1996 Opinion. Accordingly, it was only then that plaintiff could counter BTC's contention that this Court's 1996 Opinion already had found that Bonnie & Co. was fully liable for all of BTC's attorneys' fees in this action, as well as BTC's new arguments. Plaintiff does concede, however, that the 1996 Opinion found that Bonnie & Co. "is obligated to pay 'expenses of collection' incurred by [BTC] with respect to [Bonnie & Co.] accounts receivable." *Id.* at 12.

This Court has not specifically found that BTC is entitled to all of its litigation expenses for both defending and prosecuting the instant action. Moreover, this Court has not yet considered the merits of parties' respective arguments regarding the extent to which plaintiffs are liable for BTC's attorneys' fees. Accordingly, this Court finds that this issue is not precluded, as law of the case, from present consideration.

As a result, there remain two issues for resolution in the instant Opinion: (1) the release of the collateral, including whether plaintiffs' collateral secures BTC's attorneys' fees as well as Bonnie & Co.'s factor accounts; and (2) the extent of plaintiffs' liability for BTC's attorneys' fees. Each of these issues will be considered individually.

### C. The Release of the Collateral

As noted above, plaintiffs argue that the only liability which the $1,000,000 collateral secures is Bonnie & Co.'s $127,608 factor account debit, and that, because that debit has been paid to BTC, the collateral should be released. Defendant, however, asserts that the collateral secures not only the factor account debit, but also plaintiffs' liabilities for BTC's reasonable attorneys' fees in this litigation. Until those attorneys' fees are paid, BTC contends that the collateral should not be released. This Court will consider the

parties two arguments concerning the release of the collateral individually.

### 1. Plaintiff's Claim That the Collateral Secures Only Bonnie & Co.'s Unpaid Factor Account Balance

Count Four of plaintiffs' Complaint alleges that BTC wrongfully failed to release the $1,000,000 Treasury Bill that Boerer pledged to secure Bonnie & Co.'s obligations under the Factoring Agreement. (Complaint ¶¶ 42–46); *Bonnie & Co.,* 945 F.Supp. at 714. Plaintiffs' claim that BTC's "failure to release the ... Treasury Bill is solely due to defendant's attempt to put pressure on Boerer and to force her to accept defendant's [breaches of the Factoring Agreement alleged] ... in the First Count." (Complaint ¶ 45.) Plaintiffs thus demand in Count Four the immediate return of this collateral "less the maximum sum defendant could possibly be jeopardized through any obligation of [Bonnie & Co.] to the defendant," or approximately $900,000. *Id.* ¶¶ 42–43. Plaintiffs also claim to have "sustained damages in a sum which has yet to be calculated but which will be established at trial" and seeks $250,000 in punitive damages. *Id.* ¶¶ 46–47.

As this Court noted in its 1996 Opinion, "[t]he issue of the release of a portion of the $1,000,000 Treasury Bill previously was before this Court on a motion for summary judgment brought by plaintiffs in 1992. *Bonnie & Co.,* 945 F.Supp. at 714; (Order, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.,* 91 Civ. 0341 at 2 (Mar. 6, 1992) ("Mar. 1992 Order").) In denying plaintiffs' 1992 motion for summary judgment, this Court noted that "[d]efendant has an undisputed security interest in the collateral at issue here," and that releasing a portion of the collateral without payment of the debt for which it was pledged would be a violation of Article Nine of the New York Uniform Commercial Code (the "New York UCC"). *Bonnie & Co.,* 945 F.Supp. at 714. The controlling reason for this Court's 1992 denial of plaintiffs' motion for summary judgment on this issue, however, was that "the amount of collateral necessary to secure defendant's security as this litigation continues is a genuine issue of material fact." *Id.*

In the 1996 Opinion, this Court relied upon the March 1992 Order in denying defendant's motion for summary judgment on Count Four. *Id.* Specifically, this Court found that "it remains as true now as it did [in 1992] that 'the amount of collateral necessary to secure defendant's security as this litigation continues is a genuine issue of material fact' because plaintiffs claim that they are owed $221,000 by BTC for BTC's alleged breaches the Factoring Agreement, while BTC claims it is owed $127,608.35 plus interest[ ] by plaintiffs for debts arising under the Factoring Agreement." *Id.* (quoting Mar. 1992 Order at 2) (internal citation omitted). In addition to denying BTC's motion for summary judgment on Count Four on the basis of a disputed issue of material fact, this Court granted BTC's motion for summary judgment on plaintiffs' claim for punitive damages in Count Four. *Id.* at 715. As a result, after the 1996 Opinion, Count Four exists as a demand for the release of the Treasury Bill and for damages plaintiffs sustained "in an amount to be determined at trial," but not for punitive damages. (Complaint ¶ 46.)

In her second attempt to obtain summary judgment on this issue—and the third time a party has asked this Court to pass upon it— Boerer asserts that she is entitled to the return of the Treasury Bill because Bonnie & Co.'s obligations under the Factoring Agreement have been fulfilled. (Pltf.Memo at 8.) First, Boerer argues that, under the New York UCC, BTC "is required to release Boerer's side-collateral when all obligations under the [Security] Agreement have been satisfied." *Id.* Second, Boerer contends that, "under the plain language of the [Security] Agreement, [BTC] must release Boerer's side-collateral when [Bonnie & Co.'s] obligations under the Factoring Agreement are satisfied." *Id.* at 9.

After explaining that under both the New York UCC and the Security Agreement she is entitled to the Treasury Bill when Bonnie & Co.'s obligations are fulfilled, Boerer then endeavors to demonstrate that Bonnie & Co.'s debts have, in fact, been met. *Id.* Boerer asserts that the $127,608 which BTC counterclaims against Bonnie & Co. resulted

from BTC's charging back that sum to Bonnie & Co. "when the Allied/Federated stores filed for Chapter 11 bankruptcy protection in January 1990." *Id.* While Boerer maintains that this charge back was improper because, under Section 1.3 of the Factoring Agreement, BTC retained risks due to a customer's financial inability to pay, *id.* at 9 n. 2, Boerer contends that, regardless of the propriety of that charge back, BTC's "counterclaim was subsequently mooted by Allied/Federated's full payment of [its] outstanding invoices." *Id.* at 9 (emphasis omitted).

Boerer asserts that, "[a]s of April 1, 1990, [BTC] sold its factoring division—along with most [Bonnie & Co.] receivables—to BNY Financial Corporation [ ("BNY") ]. At that point all collection activities, including the filing of bankruptcy Proofs of Claim on account of [Bonnie & Co.] and the negotiation of a settlement with Allied/Federated, were carried out by BNY...." *Id.* at 9–10. Boerer contends that "[p]ursuant to [a] September 1994 bankruptcy settlement between Allied/Federated and BNY, [BTC] was paid $175,128.32 and immediately credited that amount to [Bonnie & Co.'s] factor account, leaving an alleged debit to [Bonnie & Co.'s] account of $6,506.22 in accrued interest." *Id.* at 10. While Boerer disputes the legitimacy of these interest charges, *id.* at 10 n. 3, Boerer alleges that such charges are irrelevant because, following the Allied/Federated payment, BTC "voluntarily agreed to credit [Bonnie & Co.'s] factor account another $57,-698.92, thus wiping out the alleged $6,506 debit." *Id.* at 10. Boerer further contends that this credit "should have created a $51,-192.70 positive factor balance in [Bonnie & Co.'s] factor account, but [BTC] instead wrongfully charged all of its attorney's [sic] fees to the [Bonnie & Co.] account...." *Id.* at 10 n. 4.

As a result, Boerer argues that Bonnie & Co. "never owed the $127,608 that [BTC] sought in its counterclaim. That alleged debit balance existed because of Allied/Federated's financial inability to pay and because of [BTC's] own error in administering [Bonnie & Co.'s] factor account." *Id.* at 10–11. Boerer maintains, however, that "regardless of whether the $127,608 charge back and

counterclaim was legitimate or not, the fact remains that this amount has now been paid in full, as admitted by [BTC] in its May 26, 1995[,] and June 4, 1996[,] letters to the [Bankruptcy] Court." *Id.* at 11 (emphasis omitted). Because "all of [Bonnie & Co.'s] obligations have been repaid to [BTC] in full, there is no justifiable reason for [BTC] to retain its hold on Boerer's $1[,000,000] side-collateral, and release of the collateral is required" under both the New York UCC and the Security Agreement. *Id.*

In opposition to plaintiff's argument for the release of the collateral, BTC does not challenge plaintiff's evidence that Bonnie & Co.'s $127,608 factor account debit has been satisfied by the Allied/Federated bankruptcy settlement. As noted above, on summary judgment, if the moving party satisfies its burden of production by establishing the absence of a disputed issue of material fact, the burden shifts to the non-movant, who must come forward with evidence to establish such a factual dispute. Fed.R.Civ.P. 56(e); *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. In the instant case, plaintiff has carried her burden of establishing that the factor account debit has been paid, and BTC has not carried its burden of establishing a material dispute to plaintiff's showing in this particular instance. However, because defendant argues that its attorneys' fees are secured by that collateral, this Court must consider that argument before ultimately determining whether summary judgment is appropriate on plaintiff's claim for the release of the collateral.

### 2. *BTC's Argument That the Collateral Secures Plaintiffs' Liability for BTC's Attorneys' Fees*

BTC opposes Boerer's motion for summary judgment on Count Four by asserting that "BTC as a matter of law is entitled to retain the collateral as security until plaintiffs' continuing liabilities and obligations due to BTC are fully reimbursed to BTC." (BTC Opp.Memo at 1.) Rather than contesting Boerer's assertion that BTC's $127,608 counterclaim against plaintiffs has been satisfied, BTC contends that the Treasury Bill was pledged as collateral for all of Bonnie & Co.'s liabilities to BTC, including BTC's attorneys' fees in this litigation under the Factoring Agreement, the Limited Guaranty and the Security Agreement. *Id.* at 2. Until plaintiffs reimburse BTC for its attorneys' fees, BTC argues that returning the collateral is inappropriate. *Id.*

In her motion for summary judgment, Boerer asserts that BTC's argument that "it can retain Boerer's side-collateral on the ground that the Factoring Agreement, Limited Guaranty, and [Security] Agreement allegedly require [Bonnie & Co. and Boerer] to pay [BTC's] legal expenses incurred (and to be incurred) in this lawsuit" is "based on a grossly distorted—and downright absurd—reading of these agreements." (Pltf.Memo at 12.) The remainder of Boerer's argument, however, pertains to the amount of BTC's legal expenses for which she is liable, not to the issue of whether plaintiff's liability is secured by the $1,000,000 collateral, and thus, prevents the collateral's release. Boerer failed to correct this oversight in her reply memorandum in support of her motion for summary judgment. Although she titles a heading "Boerer is entitled to the release of her collateral, because [BTC] is not entitled to charge any of its legal expenses to [Bonnie & Co's] factor account," (Pltf.Reply Memo at 6), as in her initial submission, each of the arguments under that heading concerns the extent of Boerer's liability for BTC's legal expenses, not whether the collateral secures that liability. *Id.* at 8–26.

Whether plaintiff's liability for BTC's attorneys' fees is secured by the $1,000,000 collateral is a question to be determined by reference to the text of the Security Agreement, pursuant to which Boerer pledged the collateral to BTC. As such, whether summary judgment is appropriate on this issue is a matter of contractual interpretation.

The Second Circuit's standards for considering a summary judgment motion in a contract dispute are firmly established. "[I]n a contract dispute, summary judgment may be granted only where the language of the contract is unambiguous." *Nowak v. Ironworkers Local 6 Pension Fund,* 81 F.3d 1182, 1192 (2d Cir.1996) (citation omitted). "Under New York law, whether a written con-

tract is unambiguous is a question of law for the trial court whose determinations will be reviewed *de novo.*" *Id.* (citing *W.W.W. Assoc. Inc. v. Giancontieri,* 77 N.Y.2d 157, 163, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990)).

Contract terms are ambiguous if they are capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

*Nowak,* 81 F.3d at 1192 (citation omitted). Conversely, "no ambiguity exists when contract language has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference in opinion.'" *Sayers v. Rochester Tel. Corp. Supplemental Mgt. Pension Plan,* 7 F.3d 1091, 1095 (2d Cir. 1993) (quoting *Breed v. Insurance Co. of N. America,* 46 N.Y.2d 351, 355, 413, N.Y.S.2d 352, 385 N.E.2d 1280 (1978)).

Even when parties dispute the meaning of specific contract clauses, a Court's task is "to determine whether such clauses are ambiguous when 'read in the context of the entire agreement.'" *Sayers,* 7 F.3d at 1095 (quoting *W.W.W. Assoc.,* 77 N.Y.2d at 163, 565 N.Y.S.2d 440, 566 N.E.2d 639); *see also Williams Press, Inc. v. New York,* 37 N.Y.2d 434, 440, 373 N.Y.S.2d 72, 335 N.E.2d 299 (1975). By examining the entire contract, courts "safeguard against adopting an interpretation that would render any individual provision superfluous." *Sayers,* 7 F.3d at 1095 (citing *Two Guys from Harrison–N.Y., Inc. v. S.F.R. Realty Assoc.,* 63 N.Y.2d 396, 403, 482 N.Y.S.2d 465, 472 N.E.2d 315 (1984); *see also Rothenberg v. Lincoln Farm Camp, Inc.,* 755 F.2d 1017, 1019 (2d Cir.1985); *Muzak Corp. v. Hotel Taft Corp.,* 1 N.Y.2d 42, 46, 150 N.Y.S.2d 171, 133 N.E.2d 688 (1956). However, "[p]arties to a contract may not create an ambiguity merely by urging conflicting interpretations of their agreement." *Sayers,* 7 F.3d at 1095 (citations omitted).

The Security Agreement provides in relevant part:

The undersigned [Boerer] herewith deposits and pledges with [BTC], a New York corporation (hereinafter called the "Bank") as security and *every liability,* direct or contingent, joint, several, or independent, of Bonnie & Company Fashions, Inc. (hereinafter called the "Borrower") now or hereafter existing, due or to become due to, or held or to be held by, the Bank, whether created directly or acquired by assignment or otherwise, the following property (hereinafter called the "hypothecated property") belonging to the undersigned: Treasury Bill in the amount of $1,000,000.00 together with all funds due or to become due thereon and the undersigned empowers the Bank to demand and receive any monies due or to become due or to apply for redemption or repurchase the same or other investment securities.

(Notice of Motion for Summary Judgment, *Bonnie & Co. v. Bankers Trust Co.,* 91 Civ. 0341 ("Notice of Motion") at Exh. A (Apr. 8, 1994) (emphasis added).) In the instant motion, neither party has argued that plaintiffs' liability for BTC's attorneys' fees is encompassed by the language of the Security Agreement. Instead, both parties have asserted conclusively that BTC's attorneys' fees are (or are not) secured by the collateral. (Pltf.Memo at 12); (BTC Opp.Memo at 1); (Pltf.Reply Memo at 6.)

▪ Nevertheless, looking to this excerpt as well as to the surrounding text of the Security Agreement, this Court finds that it unambiguously states that the Treasury Bill is collateral for plaintiffs' liability to BTC for Bonnie & Co's unpaid factor accounts, as well as for any attorneys' fees and costs for which plaintiffs are liable. The Security Agreement plainly states that Boerer "deposit[ed] and pledge[d]" the Treasury Bill as security for "every liability, direct or contingent, joint several or independent, of [Bonnie & Co.]" This Court found in the 1996 Opinion that plaintiffs are liable, at least, for BTC's expenses in collecting the Bonnie & Co. indebtedness. *Bonnie & Co.,* 945 F.Supp. at 728–30. This liability obviously falls within the "every liability" of Bonnie & Co. for which Boerer pledged the Treasury Bill as collateral. As a result, this Court finds that plain-

tiffs' motion for summary judgment for the immediate release of the collateral should be denied. It is inappropriate for this Court to order the release of Boerer's collateral until it is demonstrated that all of plaintiffs' liabilities to BTC have been satisfied.

### D. The Extent of Plaintiffs' Liability For Defendant's Litigation Expenses

In her motion for summary judgment, Boerer claims that the Factoring Agreement, the Limited Guaranty and the Security Agreement all require plaintiffs to pay only BTC's "expenses of collection" in its efforts to enforce payment of Bonnie & Co.'s factor account obligations of $127,608. (Pltf.Memo at 12–13.) Boerer asserts, however, that "going outside its own pleading, [BTC] argues that *all* of its legal expenses incurred in this action are chargeable to [Bonnie & Co.'s] factor account, not just those 'expenses of collection' relating to its $127,608 counterclaim[,] but also those fees incurred defending plaintiffs' affirmative claims." *Id.* at 13 (emphasis in original).

Boerer argues that "[f]or three reasons[,] [BTC's] interpretation of the agreements is simply wrong." *Id.* at 14. In her reply memorandum, Boerer both expands these three arguments, and offers three more. (Pltf.Reply Brief, at 8–27.) Although offering new arguments in reply papers is typically improper, this Court finds that Boerer permissibly did so here because her initial papers were filed before the 1996 Opinion was handed down and BTC's opposition submissions raised arguments based on the 1996 Opinion. As a result, Boerer's reply papers are her only vehicle with which to deal with these new issues and arguments. Moreover, Boerer complied with this Court's Individual Rule 4(d) and explained why these issues were not adequately discussed in her moving papers. *Id.* at 7 n. 3 & 9 n. 5.

First, Boerer asserts that, under a proper construction of the Factoring Agreement under New York law, "most of [BTC's] attorney's [sic] fees were incurred defending [Bonnie & Co.'s] affirmative claims[,] [and] [t]herefore, they are not 'expenses of collection' under Section 6.2 of the Factoring Agreement, but rather relate to a tort/contract [law]suit between the parties." (Pltf.Memo at 14.) In her reply submission, Boerer details this argument, claiming that, under New York law, the Factoring Agreement's attorneys' fees provision applies only to third-party lawsuits, not to lawsuits between the agreement's parties. (Pltf.Reply Memo at 12–17.) Second, Boerer claims that "even the attorneys [sic] fees incurred by [BTC] prosecuting its $127,608 counterclaim are not recoverable here, because [BTC] did not prevail against plaintiffs on that collection claim. Rather, the alleged debit balance was satisfied through the payment of the invoices by [Bonnie & Co.'s] customer (Allied–Federated), and through a voluntary credit given by [BTC]." *Id.* Third, Boerer argues that "even if [BTC] can be considered a prevailing party, it is still only entitled to a small, finite collection fee...." *Id.*

In her reply brief, Boerer offers three more arguments regarding the level of plaintiffs' liability for BTC's attorneys' fees. First, Boerer looks to *ejusdem generis,* a doctrine of contractual interpretation under which "a court is to construe general contractual language in accordance with the specific phrases that precede it." (Pltf.Reply Memo at 10–11.) According to Boerer, an interpretation of Section 6.2 pursuant to *ejusdem generis* requires that plaintiffs are liable only for BTC's expenses of collection, not for all of its litigation costs in this case. *Id.* Second, Boerer claims that contractual attorney fee provisions that require indemnification regardless of outcome are void and unenforceable as against public policy. *Id.* at 17–19. Third, Boerer asserts that BTC did not make any compensable collection efforts. *Id.* at 21–25.

This Court need not address each of these arguments individually in order to determine the extent of plaintiffs' liability under the Factoring Agreement. Accordingly, this Court will consider only the parties' arguments concerning the proper construction of the attorneys' fees provision of the Factoring Agreement.

According to Boerer, New York law provides that attorneys' fees are "incidents of litigation and the prevailing party may not

collect them from the loser," except where authorized by a statute, a court order, or an agreement between the parties. *Id.* at 15. Boerer claims, however, that "[e]ven where there is a contractual agreement that one party will indemnify the other party for attorneys [sic] fees, that provision will be construed narrowly" in order to avoid implying into that contract a duty which the parties did not intend to be assumed. *Id.* Accordingly, Boerer asserts that New York law holds that a "court should not infer a party's intention to waive the benefit of the rule [that the prevailing party may not collect attorneys' fees from the loser] unless the intention to do so is *unmistakably clear* from the language of the promise." *Id.* (emphasis in original).

In view of these principles, Boerer maintains that "[u]nder the clause of Section 6.2 that [BTC] relies upon in its second counterclaim, [BTC] can only recover 'expenses of collection.'" *Id.* at 16. Boerer asserts that BTC's "alleged $463,353 in legal fees could not possibly have been incurred prosecuting an ordinary collection claim for $127,608," but instead were incurred "defending plaintiffs' affirmative tort/contract claims." *Id.* Accordingly, Boerer argues that BTC's litigation costs are "simply ordinary litigation expenses incurred in defending an unrelated lender liability claim filed by [Bonnie & Co.] and Boerer," and "are not recoverable under the Factoring Agreement, Limited Guaranty, or [Security] Agreement." *Id.*

Furthermore, Boerer claims that "any attorneys [sic] fees incurred by [BTC] in prosecuting its Second, Fourth and Seventh Counterclaims for attorneys [sic] fees are not compensable as a matter of law." *Id.* at 20. Boerer asserts that, under New York law, "a general contract provision for the shifting of attorneys' fees does not authorize an award of fees for time spent in seeking the fees themselves." *Id.* As a result, Boerer argues that "th[is] Court should not permit [BTC] to advance the circular argument that it can recover attorneys [sic] fees ... incurred in prosecuting its counterclaims for attorneys [sic] fees." *Id.*

In opposition to Boerer's arguments, BTC states that Boerer misreads the Factoring Agreement to limit plaintiffs' liability for BTC's attorneys' fees to "those incurred in collection of the principal and interest portions of Bonnie & Co.'s debit balance under the Factoring Agreement." (BTC Opp. Memo at 2.) Instead, BTC argues that Boerer "ignore[s] the fact that the Factoring Agreement *also* unambiguously requires Bonnie & Co. (and Boerer in turn pursuant to her [Limited] Guaranty) to pay BTC's reasonable attorneys' fees and expenses incurred in connection with 'prosecuting or defending' any lawsuit 'arising out of or in any way relating to' the Factoring Agreement," and is not limited to the costs of collection. *Id.* (emphasis in original). BTC further contends that "[a]ll of those attorneys' fees and expenses are expressly defined as liabilities of Bonnie & Co. owed to BTC...." *Id.*

In support of its position that plaintiffs owe BTC all of BTC's attorneys' fees relating to this litigation, BTC looks to the 1996 Opinion. *Id.* BTC points out that this Court previously found that "Section 6.2 of the Factoring Agreement ... clearly and unambiguously renders Bonnie & Co. liable for all expenses incurred by BTC in connection with BTC's efforts to collect from Bonnie & Co. an obligation 'arising out of or in any way related to this [Factoring] Agreement.'" *Id.* (citing *Bonnie & Co.*, 945 F.Supp. at 728.) Moreover, this Court also found that BTC is entitled to "full reimbursement by Bonnie & Co. of all its reasonable attorneys' fees, costs and disbursements 'arising out of or in any way related to' the Factoring Agreement." *Id.* at 2–3.

In addition to relying upon this Court's previous findings with respect to plaintiffs' liability for BTC's attorneys' fees, BTC also argues that "New York enforces agreements which provide for the payment of attorneys' fees and holds that such agreements cover attorneys' fees under the very circumstances present here," including fees incurred in prosecuting counterclaims. *Id.* at 3. BTC thus argues that, because Section 6.2 of the Factoring Agreement requires Bonnie & Co. to pay BTC's attorneys' fees and expenses incurred in defending or prosecuting any actions or proceedings "in any way related to" the Factoring Agreement, "plaintiffs are re-

quired as a matter of law to pay to BTC all of its incurred and continuing costs and expenses of this litigation...." *Id.* at 5.

In plaintiff's reply submission, Boerer offers a more detailed explanation for her claim that, under New York law, plaintiffs are responsible for only BTC's expenses of collection, not for BTC's defense and prosecution of this case. She argues that "Section 6.2 provides that [Bonnie & Co.] is responsible for [BTC's] expenses, including attorneys [sic] fees and costs, but only in four limited circumstances[.]" (Pltf.Reply Memo at 9.) Boerer then quotes Section 6.2, individually numbering those four circumstances:

> [Bonnie & Co.] shall be liable for and agree to indemnify and hold [BTC] harmless with respect to: [1] any tax or penalty imposed upon any transaction under this Agreement or giving rise to Accounts or which [BTC] may be required to withhold or pay for any reason; [2] all fees costs and expenses, including taxes of any kind, which [BTC] may incur in filing financing statements pursuant to the UCC or other public notices, and in making lien or other title examinations; [3] all fees, costs and *expenses of collection* incurred by [BTC] in efforts to enforce payment of any of the Obligations or to enforce payment of any Accounts, charged or chargeable to our account; [4] all costs and expenses incurred by [BTC] in *protecting, maintaining, preserving or enforcing the sale, assignment, pledge, lien and security interests* granted to [BTC] hereunder, whether through judicial proceedings or otherwise, or in defending or prosecuting any actions or proceedings arising out of or in any way related to this Agreement; and the reasonable fees, costs, and disbursements of any attorney whom [BTC] engage[s] in connection with any or all of the foregoing....

*Id.* at 9–10 (emphasis in original). Boerer then argues that "[c]learly, Section 6.2[1] and [2], relating to taxes/penalties and filing costs, having no bearing on this case." *Id.* at 12. Boerer further explains that "[u]nder Section 6.2[3][,] [Bonnie & Co.] is obligated to pay 'expenses of collection' incurred by [BTC] with respect to [Bonnie & Co.'s] ac-

counts receivable, as this Court has already held." *Id.* As a result, Boerer contends, "these first three provisions of Section 6.2 do not require reimbursement of [BTC's] legal fees incurred in defending plaintiffs' lender liability action," and thus, Section 6.2[4] is the contractual provision controlling this Court's resolution of the issue of the extent of plaintiffs' liability for BTC's attorneys' fees. *Id.*

In construing Section 6.2[4], Boerer re-emphasizes her previous position that, in New York, "an attorney fee provision will not apply to fees incurred between the contracting parties unless that intention is '*unmistakably clear* from the language' of the contract." *Id.* at 13 (emphasis in original). In addition, Boerer asserts that "[i]n applying this stringent 'unmistakably clear' test ... [c]ourts have consistently held that contractual attorney fee provisions similar to Section 6.2[4] apply only to legal expenses incurred in third-party suits." *Id.* Accordingly, Boerer maintains that "an attorney fee indemnity provision[ ] applies only to third-party [law]suits unless it is 'unmistakably clear' from the language that it applies to [law]suits between the contracting parties." *Id.* at 15.

■ Under the general rule in New York, "attorneys' fees are incidents of litigation and a prevailing party may not collect them from the losing party unless such an award is authorized by agreement between the parties, statute or court rule." *Bourne Co. v. MPL Communications, Inc.*, 751 F.Supp. 55, 57 (S.D.N.Y.1990) (Sprizzo, J.) (citing *In re A.G. Ship Maintenance Corp. v. Lezak*, 69 N.Y.2d 1, 503 N.E.2d 681, 511 N.Y.S.2d 216 (1986)). Under New York law, however, "the intent to provide for counsel fees [by agreement between the parties] as damages for breach of contract must be 'unmistakably clear' in the language of the contract." *Bridgestone/Firestone, Inc. v. Recovery Credit Svcs., Inc.*, 98 F.3d 13, 20–21 (2d Cir.1996) (citing New York law). As the New York Court of Appeals explained in *Hooper Assoc. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 549 N.Y.S.2d 365, 548 N.E.2d 903 (1989):

The words in a contract are to be construed to achieve the apparent purpose of the parties. Although the words might seem to admit a larger sense, yet they should be restrained to the particular occasion and to the object which the parties had in view. This is particularly true with indemnity contracts. When a party is under no legal duty to indemnify, a contract assuming that obligation must be strictly construed to avoid reading into it a duty which the parties did not intend to be assumed. The promise should not be found unless it can be clearly implied from the language and purpose of the entire agreement and the surrounding facts and circumstances. *Inasmuch as a promise by one party to a contract to indemnify the other for attorney's fees incurred in litigation between them is contrary to the well-understood rule that parties are responsible for their own attorney's fees, the courts should not infer a party's intention to waive the benefit of the rule unless the intention to do so is unmistakably clear.*

74 N.Y.2d at 491–92, 549 N.Y.S.2d at 367, 548 N.E.2d 903 (internal citations omitted) (emphasis added).

■ Furthermore, when courts are confronted with attorneys' fees provisions which do not make "unmistakably clear" the indemnification of the contractual parties, courts read the provisions to apply only to legal expenses incurred through litigation with non-contractual, or third, parties. In *Hooper Assoc.*, for example, plaintiff Hooper sought indemnification from defendant AGS for legal fees arising from plaintiff's claims against AGS. 74 N.Y.2d at 491, 549 N.Y.S.2d at 367, 548 N.E.2d 903. The indemnification clause at issue obligated AGS to "indemnify and hold harmless" Hooper from "any and all claims," including reasonable attorneys' fees arising in connection with the performance of the contract. 74 N.Y.2d at 490 n. 1, 549 N.Y.S.2d at 366 n. 1, 548 N.E.2d 903. Analyzing the language of the contract, the Court of Appeals held that the agreement did not unmistakably provide for the indemnification of claims between the parties to the agreement. Instead, the court determined that

[t]he clause in this agreement does not contain language clearly permitting plaintiff to recover from defendant the attorney's fees incurred in a suit against defendant. On the contrary, it is typical of those which contemplate reimbursement when the indemnitee it required to pay damages on a third-party claim.... All [the claims for which defendant agreed to indemnify plaintiffs' attorneys' fees] are susceptible to third-party claims ... [and] [n]one are exclusively or unequivocally referable to claims between the parties themselves or support an inference that defendant promised to indemnify plaintiff for counsel fees in an action on the contract.

74 N.Y.2d at 492, 549 N.Y.S.2d at 368, 548 N.E.2d 903.

Even more recently, in *Bridgestone/Firestone*, the Second Circuit applied the "unmistakably clear" test to an attorneys' fees indemnification clause and dismissed plaintiff's claims for attorneys' fees. 98 F.3d at 21. In that case, the attorneys' fees provisions at issue read:

The [defendant] shall indemnify and save [defendant] harmless from any and all claims, demands, or causes of action, any and all costs or expenses, including attorneys' fees, that may be asserted due or arising out of [defendant's] [contractual] activity....

*Id.* Judge Winter determined not only that "[t]his language is not an unmistakably clear statement that such damages were intended," but also that "[t]he language may easily be read as limited to third party actions against [plaintiff]." *Id.; see also Sequa Corp. v. Gelmin*, 851 F.Supp. 106, 110–11 (S.D.N.Y.1994); *Bourne Co.*, 751 F.Supp. at 57.

■ The holdings of these cases require the same result here. Section 6.2 of the Factoring Agreement provides:

[Bonnie & Co.] shall be liable for and agree to indemnify and hold you harmless with respect to: [1] any tax or penalty imposed upon any transaction under this Agreement or giving rise to Accounts or which [BTC] may be required to withhold or pay for any reason; [2] all fees costs

and expenses, including taxes of any kind, which [BTC] may incur in filing financing statements pursuant to the UCC or other public notices, and in making lien or other title examinations; [*3*] all fees, costs and expenses of collection incurred by [BTC] in efforts to enforce payment of any of the Obligations or to enforce payment of any Accounts, charged or chargeable to our account; [*4*] *all costs and expenses incurred by [BTC] in protecting, maintaining, preserving or enforcing the sale, assignment, pledge, lien and security interests granted to [BTC] hereunder, whether through judicial proceedings or otherwise, or in defending or prosecuting any actions or proceedings arising out of or in any way related to this Agreement;* and the reasonable fees, costs, and disbursements of any attorney whom [BTC] engage[s] in connection with any or all of the foregoing. [BTC] may charge to [Bonnie & Co.'s] account, at any time and from time to time, any or all of the foregoing amounts which shall be added to and deemed part of the Obligations.

(Notice of Motion at Exh. B (emphasis added).) As plaintiff correctly points out, Section 6.2 of the Factoring Agreement provides that Bonnie & Co. is liable for BTC's expenses, including attorneys' fees, in four specific instances. For simplicity's sake, this Court will adopt the numbering of Section 6.2 which plaintiff suggests. Section 6.2[1] and [2], which involve taxes and penalties, are irrelevant to the instant case. In addition, Section 6.2[3] is the basis of this Court's grant of attorneys' fees to BTC for its "expenses of collection" in the 1996 Opinion. Therefore, as plaintiff argues, if BTC is to be reimbursed for its entire litigation costs, it must be because Section 6.2[4] makes such an outcome "unmistakably clear."

The text of Section 6.2[4], however, does not even approach this lofty standard. "All costs and expenses incurred by [BTC] in protecting, maintaining, preserving or enforcing" BTC's rights and interests acquired under the Factoring Agreement can easily be read to protect BTC from claims to its rights and interests by third parties. Moreover, Section 6.2[4] clearly is not "exclusively or unequivocally referable to claims between the parties themselves," and cannot be construed

to "support an inference that [Bonnie & Co.] promised to indemnify [BTC] for counsel fees in an action on the contract." *See Hooper Assoc.,* 74 N.Y.2d at 492, 549 N.Y.S.2d at 367, 548 N.E.2d 903.

BTC's arguments that plaintiffs' must indemnify BTC for all of its attorneys' fees in this litigation are not only unpersuasive, they are legally incorrect. BTC's first contention, that the 1996 Opinion found plaintiffs liable for all of BTC's attorneys' fees, is simply wrong. As explained above, when this Court granted summary judgment to BTC on its Sixth Affirmative Defense/Second Counterclaim, this Court found that Section 6.2 of the Factoring Agreement rendered Bonnie & Co. liable for all fees, costs and expenses, including attorneys' fees, incurred by BTC in collecting Bonnie & Co.'s unpaid accounts related to the Factoring Agreement. *Bonnie & Co.,* 945 F.Supp. at 728–29. Nowhere did this Court determine that Bonnie & Co. was liable for every dollar spent by BTC in litigating this action. To further clarify the findings of the 1996 Opinion, when this Court granted summary judgment to BTC on its Eighth Affirmative Defense/Fourth Counterclaim, this Court determined that the Limited Guaranty rendered Boerer personally liable for BTC's legal expenses to the same extent of Bonnie & Co.'s liability for those expenses. *Id.* at 730. As a result, both Bonnie & Co. and Boerer are liable for BTC's costs of collecting Bonnie & Co.'s indebtedness only, not for any other expenses incurred by BTC in this litigation.

Second, the precedent offered by BTC to establish plaintiffs' liability for all of its litigation expenses are, as plaintiff correctly argues, outdated and factually distinct from the instant case. BTC offers *Tartell v. Chelsea Nat'l Bank,* 351 F.Supp. 1071 (S.D.N.Y.), *aff'd per curiam,* 470 F.2d 994 (2d Cir.1972), and *Towers Charter & Marine Corp. v. Cadillac Ins. Co.,* 894 F.2d 516 (2d Cir.1990), in support of its position that "New York law enforces agreements which provide for the payment of attorneys' fees and holds that such agreements cover attorneys' fees under the very circumstances present here." (BTC Opp.Memo at 3–4.) *Tartell,* however, was decided seventeen years before the New York Court of Appeals handed down *Hooper Assoc.,* the opinion which announces that con-

tractual attorneys' fees indemnification provisions do not alter the general rule that parties are responsible for their own litigation costs absent an "unmistakably clear" statement to the contrary. 74 N.Y.2d at 491–92, 549 N.Y.S.2d at 367, 548 N.E.2d 903. Accordingly, its precedential value is suspect, to say the least. Similarly, *Towers Charter & Marine* was argued two months before *Hooper Assoc.*, was decided, and, as plaintiff argues, "it is quite likely that the [Second Circuit] was not apprised of *Hooper [Assoc.]* " when it rendered its decision. (Pltf.Reply Memo at 17 n. 8.) Moreover, the attorneys' fees indemnification provision in *Towers Charter & Marine* was substantially more explicit than Section 6.2 of the Factoring Agreement in rendering the contractual parties liable for more than simply the "costs of collection" of a debt. 894 F.2d at 525.

As a result, this Court finds that the 1996 Opinion's grant of summary judgment to BTC with respect to BTC's Sixth Affirmative Defense/Second Counterclaim and Eighth Affirmative Defense/Fourth Counterclaim appropriately rendered Bonnie & Co. and Boerer liable for BTC's costs of collection of the Bonnie & Co. indebtedness. Accordingly, this Court finds that plaintiff's motion for summary judgment should be denied as to those two claims, with the above clarification delineating the extent of plaintiffs' liability. This Court also finds, however, that this Court's decision in the 1996 Opinion to deny BTC's motion for summary judgment on its Eleventh Affirmative Defense/Seventh Counterclaim should be revisited in light of the arguments and evidence presented in support of the instant motion for summary judgment.

As explained above, if a party moving for summary judgment satisfies its burden of establishing the absence of a genuine question of material fact on an issue, the burden shifts to the non-moving party to present specific facts that demonstrate a genuine issue for trial. Fed.R.Civ.P. 56(e); *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. In the case at bar, plaintiff has established that BTC alleged no facts under which plaintiffs could be liable for BTC's expenses arising from this litigation other than its "expenses of collection" of the Bonnie & Co. indebtedness. BTC, however, has presented no evidence and made no persuasive arguments that plaintiffs should be held liable for the attorneys' fees due to Boerer's alleged wrongful direction to the bank holding the collateral not to release it to BTC, as BTC claims in its Eleventh Affirmative Defense/Seventh Counterclaim. As a result, this Court finds that plaintiff's motion for summary judgment should be granted with respect to defendant's Eleventh Affirmative Defense/Seventh Counterclaim.

### CONCLUSION

IT IS HEREBY ORDERED THAT plaintiff's motion for summary judgment on Count Four is DENIED.

IT IS FURTHER ORDERED THAT plaintiff's motion for summary judgment on defendant's Sixth Affirmative Defense/Second Counterclaim and its Eighth Affirmative Defense/Fourth Counterclaim is DENIED.

IT IS FURTHER ORDERED THAT plaintiff's motion for summary judgment on defendant's Eleventh Affirmative Defense/Seventh Counterclaim is GRANTED.

SO ORDERED.